COMMONWEALTH *vs.* ABIMAEL COLON-CRUZ.

Worcester. September 4, 1990. - November 13, 1990.

Present: LIACOS, C.J., WILKINS, ABRAMS, NOLAN, & GREANEY, JJ.

*Homicide. Evidence,* Admissions and confessions, Identification, Hearsay, Common criminal enterprise, State of mind. *Constitutional Law,* Admissions and confessions, Waiver of constitutional rights, Assistance of counsel. *Waiver. Practice, Criminal,* Voluntariness of statement, Required finding, Grand jury proceedings, Challenge to jurors, Fair trial, Venue, Examination of jurors, Agreement between prosecutor and witness, Plea, Argument by prosecutor, Instructions to jury, New trial, Capital case. *Identification. Joint Enterprise. Grand Jury. Jury and Jurors.*

The record of the hearing on a criminal defendant's motion to suppress his statements to police amply supported the judge's findings of fact and his conclusion that the defendant's statements were voluntarily made after a knowing and intelligent waiver of his Miranda rights. [537-540]

The circumstances of a probable cause hearing held approximately two months after a criminal defendant's arrest, at which an eyewitness identified the defendant as one of the men who fled from the scene of the crime, were not so unduly suggestive as to require suppression of the witness's identification of the defendant; nor did alleged prosecutorial misconduct prevent defendant's counsel from protecting his client at the time of the identification. [540-543]

At a criminal trial, testimony by a woman as to the content of several statements that two men had made to her while the two men, along with the defendant, were in her apartment were admissible where ample evidence, apart from those statements, permitted the jury to infer that the two men and the defendant were engaged in a joint criminal enterprise at the time the statements were made. [543-545]

At a murder trial, there was sufficient evidence to warrant the denial of the defendant's motion for a required finding of not guilty as to a charge of murder in the first degree. [545-549]

Where there was ample evidence before a grand jury to allege murder in the first degree, this court declined a criminal defendant's request to inquire into the competency or sufficiency of the evidence before the grand jury. [549]

The record of a criminal proceeding did not, on its face, support the defendant's claim that the prosecutor's exercise of peremptory challenges was improperly motivated by ethnic considerations. [549-551]

No substantial risk of a miscarriage of justice was demonstrated with respect to a judge's failure to grant a criminal defendant's motion for a change of venue based on allegedly prejudical pretrial publicity. [551-552]

There was no merit to the contention by a criminal defendant that a judge should have conducted a colloquy with him before examining prospective jurors for ethnic bias where, after briefs had been filed, this court eliminated the requirement of a colloquy (*Commonwealth* v. *Ramirez*, 407 Mass. 553, 557 [1990]). [552]

No substantial risk of a miscarriage of justice appeared at a murder trial with respect to testimony given by a prosecution witness pursuant to a plea agreement. [552-553]

At a murder trial, the prosecutor's closing argument was within the bounds of propriety. [553-554]

At a criminal trial, the judge's instructions to the jury regarding joint venture and the inference of malice from the intentional use of a dangerous weapon, along with various clarifying instructions, did not create a substantial risk of a miscarriage of justice. [555-557]

At a murder trial, the judge properly submitted to the jury the issue of determining the existence of extreme atrocity or cruelty in the defendant's conduct. [557-558]

No substantial risk of a miscarriage of justice was demonstrated with respect to a criminal defendant's claims that his right to effective assistance of counsel under the Sixth and Fourteenth Amendments to the Federal Constitution were denied. [558-559]

At a murder trial, the judge did not, in the circumstances, abuse his discretion in denying the defendant's motion for a new trial without holding an evidentiary hearing under Mass. R. Crim. P. 30 (c) (3). [559-560]

INDICTMENT found and returned in the Superior Court Department on June 14, 1983.

Pretrial motions were heard by *John J. Irwin, Jr.*, J., and the case was tried before him.

*James W. Rosseel* for the defendant.

*Katherine E. McMahon*, Assistant District Attorney, for the Commonwealth.

ABRAMS, J. The defendant, Abimael Colon-Cruz, was convicted of murder in the first degree for the killing of State

Trooper George L. Hanna. Colon-Cruz appeals alleging that the judge erred in (1) denying his motion to suppress his statements to police; (2) denying his motion to suppress an identification of him by an eyewitness; (3) overruling his objections to the admission of certain testimony; and (4) denying his motion for a required finding of not guilty. Pursuant to G. L. c. 278, § 33E, the defendant raises numerous issues not raised at trial which he claims created a substantial likelihood of a miscarriage of justice. See G. L. c. 278, § 33E.[1] The defendant also contends that the judge erred in denying his motions for new trial. Last, he asks that we exercise our power pursuant to G. L. c. 278, § 33E, and enter a verdict of a lesser degree of guilt or order a new trial. We conclude that the conviction should be affirmed and that there is no reason to exercise our power under G. L. c. 278, § 33E, in the defendant's favor.

The defendant is one of three men convicted of the murder of George Hanna. See *Commonwealth v. Colon, ante* 419 (1990); *Commonwealth v. Rosado, post* 561 (1990). Because the defendant challenges the sufficiency of the evidence, we set forth in some detail facts the jurors could have found. The defendant, Abimael Colon-Cruz, also known as Emilio Otero, lived at 80 Chandler Street, Worcester, with his wife, Maria Figueroa. On the morning of February 26, 1983, Figueroa's brother, Jose Colon, and his girlfriend, Carmen Mangual, came to 80 Chandler Street, followed later by Miguel Rosado. Colon, Rosado, and the defendant spent approximately one-half hour together in the bedroom. Rosado then left to pick up his wife. When he returned, the three men spent another ten to fifteen minutes in the bedroom. At around 3 or 3:30 P.M., Rosado, Colon, and the defendant left the apartment. Colon said they were "going to check the place out." Mangual asked Colon to bring back some

---

[1]The defendant also argues that the failure of trial counsel to pursue the issues raised pursuant to G. L. c. 278, § 33E, deprived him of the effective assistance of counsel.

brandy. They came back later with the brandy. At approximately 7:30 P.M., the three men left the apartment again.

About one hour later, Hanna, a uniformed State trooper, stopped a red Vega automobile in the parking lot of J & S Liquors on Route 20 in Auburn. Witnesses testified to seeing three men in addition to Hanna standing between the two automobiles. One was spread-eagle across the front of the Vega. The other two were standing toward the rear. Shortly thereafter, gunshots were heard. John Richardson, whose house faces the rear of the liquor store, heard the shots and, based on his hunting experience, believed that the first shot was from a larger caliber gun, such as a .38 or .45, and the second from a .22 caliber weapon. Richardson went to his window and saw Hanna fall forward. Richardson observed Hanna attempt to get up and walk away. Two of the men jumped Hanna and wrestled him to the ground. The third man shot a .45 caliber gun into the police cruiser's tire. After struggling on the ground for a while, one of the men yelled, "Let's get out of here," or "get in," or "get him," and the three men climbed into the Vega from the passenger side. The man who had shot the cruiser's tire was the last to get in the Vega. The Vega then sped away. Hanna was found with seven gunshot wounds and taken to a hospital. He died at 9:50 P.M.

Colon, Rosado, and the defendant returned to 80 Chandler Street. Rosado told Mangual that the defendant shot the officer's tire. He said that the officer had the defendant's wallet. Rosado told Mangual that a police officer stopped them because the officer thought they were smoking marihuana. The men tried to explain they were not smoking marihuana. Rosado told her that he (Rosado) said, "[W]e're going to have to shoot him [the officer], because he's going to search us, and he's going to find the guns." Rosado asked Mangual to go to his house to pick up clothes, razor blades, and some other items. Throughout this time, the defendant remained silent.

Later that night, police arrested the defendant with Rosado and two others when they stopped a car near the de-

fendant's apartment. The defendant had a bag with four guns in it — including the .22 and .45 caliber guns used in the killing, and Hanna's State police gun. Further evidence connecting this defendant to the crime included an eyewitness identification of him in the Vega leaving the scene (see *infra*), and the defendant's fingerprint on the Vega. In addition, the defendant's wallet was found at the scene of the shooting.

I. *Motion to suppress defendant's statements to police.* After his arrest, the defendant was taken to the police station where he was interviewed. He answered questions posed by two State police troopers. A Worcester police officer acted as an interpreter during the interview. The defendant made a pretrial motion to suppress his statements on the ground that his statements were involuntary because he was beaten by the police. The defendant also claimed that he did not make an intelligent and knowing waiver of the rights secured by *Miranda* v. *Arizona*, 384 U.S. 436, 475 (1966).[2] Following an evidentiary hearing, the trial judge denied the motion to suppress. The defendant asserts the judge erred in denying the motion because his medical condition was such that he was not capable of making a proper waiver and because the translation into Spanish of the Miranda warnings by a police officer was not adequate to communicate fully the content of the Miranda warnings.

The motion judge made the following findings of fact. The defendant was arrested and brought to the police station at approximately 3:40 A.M. on February 27, 1983. He was in an interrogation room with State police officers Roderick Beaton and Thomas White and Worcester police officer Michael

---

[2]At the motion hearing, he also argued that police did not inform him of his right to make a telephone call. See G. L. c. 275, § 33A (1988 ed.). The judge found that no such violation had occurred. On appeal, the defendant does not argue or brief that issue. It is therefore deemed waived. See *Commonwealth* v. *Cundriff*, 382 Mass. 137, 151 n.22 (1980), cert. denied, 451 U.S. 973 (1981). See Mass. R. A. P. 16 (a) (4), as amended, 367 Mass. 919 (1975). Pursuant to G. L. c. 278, § 33E, we observe that the judge's determination that there was no violation of the statute was supported by evidence which the judge could find credible.

Portuondo. Portuondo acted as an interpreter. Portuondo read an English language Miranda card to the defendant and then translated the warnings on the card into Spanish. Portuondo then showed the defendant the English Miranda card and asked the defendant to sign the card if he understood it and was willing to talk to the police officers. The defendant signed the card. Portuondo then informed the defendant that he could make a telephone call. The defendant declined to do so.

Beaton and White then began asking questions, which were translated into Spanish by Portuondo. The defendant answered in Spanish; Portuondo translated the answers. Beaton recorded "each question and answer as they were received." After approximately one hour, the defendant indicated that he did not wish to answer any further questions, and the interview ended. During the interview, the officers noted that the defendant had a swollen nose which was bleeding slightly. One of the officers provided the defendant with a towel to wipe off the blood. At no time during the interview did the defendant complain of this injury or request medical attention.

While the defendant was being booked, he requested that he be allowed to seek medical attention. The police took the defendant to a hospital emergency room for treatment. The examining doctor found a small cut on the bridge of the defendant's nose and another small cut inside his upper lip, with some swelling in both areas. The doctor cleaned the areas. After a full examination including x-rays, the doctor determined that no further treatment was necessary. The defendant's cuts did not require suturing, medication, dressing, or hospitalization.

In reviewing the judge's ruling on a motion to suppress, we accept the motion judge's subsidiary findings unless there is clear error. We give substantial deference to the judge's ultimate findings. *Commonwealth* v. *Cunningham*, 405 Mass. 646, 655 (1989), citing *Commonwealth* v. *Tavares*, 385 Mass. 140, 144-145, cert. denied, 457 U.S. 1137 (1982). We do, however, review the judge's application of constitutional

principles to the facts. *Commonwealth* v. *Quigley*, 391 Mass.
461, 463 (1984), cert. denied, 471 U.S. 1115 (1985).

The judge's determination that Portuondo succeeded in
communicating the Miranda warnings to the defendant is
supported by the record. Portuondo learned Spanish at home,
where his parents routinely spoke it. Although he was not an
official police interpreter, on prior occasions ·Portuondo had
been an interpreter for the Worcester police. At the hearing,
defense counsel asked him to repeat in Spanish approxi-
mately the same warnings he gave to the defendant on the
night of the arrest. He then asked an experienced court inter-
preter to comment on the translation. The interpreter faulted
Portuondo's translation only by asserting that Portuondo had
a "heavy Anglo accent" and that he used two words which
were not precisely the words used in a Spanish language Mi-
randa card. There is, however, no requirement that a Mi-
randa warning be given in any precise words. *California* v.
*Prysock*, 453 U.S. 355 (1981).

The defendant next claims the warnings were defective be-
cause they were delivered and interpreted by a police officer,
who may have been biased against the defendant. The de-
fendant suggests that Portuondo may have distorted the
meaning of the Miranda warnings because of his police bias.
There is no evidence that the warnings delivered by Por-
tuondo were distorted, misleading, or inaccurate.

The defendant also claims that his statement was not vol-
untary because of his physical condition, and because the at-
mosphere in the police station that night was inherently coer-
cive. In assessing whether a statement was given freely and
voluntarily, the judge must consider the totality of the cir-
cumstances. *Commonwealth* v. *Parker*, 402 Mass. 333, 340
(1988), citing *Commonwealth* v. *Wilborne*, 382 Mass. 241,
252 (1981). There was no evidence that the defendant's
physical condition was so disabling as to render his statement
involuntary. See *Commonwealth* v. *Wills*, 398 Mass. 768,
776 (1986). Further, the judge's findings that the interview
did not involve excessive or unfair pressure on the part of the
police, and that the defendant did not possess any personal

characteristics which might render him "susceptible to police pressure," *Commonwealth* v. *Silva,* 388 Mass. 495, 501 (1983), are supported by the record. There was no error in the denial of the motion to suppress the statements.

II. *Suppression of Iandoli's identification.* At a probable cause hearing held approximately two months after the defendant was arrested, an eyewitness identified the defendant as one of the men who fled from the scene of the murder. The defendant made a pretrial motion to suppress this identification as a violation of his rights under the Sixth and Fourteenth Amendments to the Federal Constitution, claiming that the circumstances of the identification were unduly suggestive. He also claims that prosecutorial misconduct prevented defense counsel from protecting his client. There was no error.

The facts as found by the motion judge are summarized below. On February 26, 1983, at approximately 8:30 P.M., John Iandoli, Jr., was driving his pick-up truck west on Route 20 in Auburn. As he approached the J & S Liquor store, he noted a police cruiser with its blue lights activated parked near a red Chevrolet Vega. A State police officer and three Hispanic or Puerto Rican men were standing between the cars. Iandoli continued past the liquor store to the Periwinkle Pub, a short distance away. Finding the parking lot full, he drove back past the liquor store. At that time, he observed the red Vega heading east on Route 20, and the wounded State police officer standing in the roadway. Iandoli stopped and assisted the officer to the edge of the road, then returned to his truck and pursued the Vega east on Route 20, following it as it turned onto Route 290 into Worcester. He pulled his truck directly behind the Vega and recorded the registration number of the car. He observed as much as he could about the occupants of the car, then abandoned his pursuit and returned to the scene of the shooting.

The State police took Iandoli to the Worcester police station, where he was interviewed by Trooper Bennett. Iandoli examined an array of seven photographs, including one of Miguel Rosado. Iandoli stated that he could not identify any

of the photographs; that all the men photographed had full beards and none of the occupants of the car had full beards. Iandoli left the police station before the police made any arrests for the shooting of Hanna.

On February 28 and March 1, 1983, Iandoli saw photographs of Colon-Cruz, Colon, and Rosado in local newspapers. According to Iandoli, he recognized the men in the photographs as the men he had seen in the Vega on the night of February 26, 1983. On April 12, 1983, a probable cause hearing was held. Prior to the hearing, the district attorney's office provided the defendant with discovery materials which included Iandoli's statement to Trooper Bennett recounting his observations, and a witness list indicating that the Commonwealth intended to call Iandoli as a witness.

While being sworn in with the other witnesses, Iandoli observed the seven suspects in the courtroom among whom were Colon, Rosado, and this defendant. He recognized three of the men in the courtroom as the men he had seen in the Vega. Iandoli testified for the Commonwealth, but the district attorney did not ask him to identify anyone on direct examination. On cross-examination, defense counsel asked him if he could identify any of the defendants, and Iandoli pointed out Colon-Cruz, Colon, and Rosado. Iandoli testified at the trial, and again identified the defendant.

In order to suppress identification testimony, the defendant must show by a preponderance of the evidence that the procedures employed, viewed in the totality of the circumstances, were so unnecessarily suggestive and conducive to mistaken identification as to deny the defendant due process of law. See *Commonwealth* v. *Thornley*, 400 Mass. 355, 363 (1987), *S.C.*, 406 Mass. 96 (1989); *Commonwealth* v. *Correia*, 381 Mass. 65, 78 (1980). The crucial question is whether any possible mistake was the result of improper procedures on the part of the Commonwealth. *Commonwealth* v. *Paszko*, 391 Mass. 164, 172 (1984). If the defendant succeeds in showing that the pretrial identification was impermissibly suggestive, then the prosecution can offer other identification testimony only after demonstrating by clear

and convincing evidence that the identification has an independent source. *Thornley, supra* at 363.

The motion judge determined that Iandoli recognized the defendant surrounded by a number of other people during the swearing-in process. He considered whether this identification resembled a one-on-one confrontation, which, although not subject to a per se rule of exclusion, is disfavored as suggestive. See *Commonwealth* v. *Santos,* 402 Mass. 775, 781 (1988), citing *Commonwealth* v. *Storey,* 378 Mass. 312, 317 (1979), cert. denied, 446 U.S. 955 (1980). He concluded that the circumstances in this instance bore a close resemblance to a lineup, or to identifications at other probable cause hearings which have been held permissible. See *Commonwealth* v. *Cincotta,* 379 Mass. 391, 395 (1979).

The defendant suggests that the photographs of the defendant published in local newspapers soon after the shooting were the basis of Iandoli's identification, rather than his observations on the night of the shooting. The record does not support any claim that the newspaper published the photographs as a result of police contrivance. If police have not in any way manipulated press reports, then simple exposure to the media is not sufficient ground to suppress an identification. See *Commonwealth* v. *Dyer,* 389 Mass. 677, 684 (1983).[3]

The defendant next argues that he was denied his right to counsel at an identification because the prosecution did not notify him that Iandoli could identify him. The motion judge gave no credence to the allegations of prosecutorial misconduct, because a "cursory reading" of the discovery material supplied to the defendant would have revealed that Iandoli could identify him.

The defendant claims that his Sixth and Fourteenth Amendment rights were violated by the circumstances of the identification. We do not agree. Defense counsel was present

---

[3]Defense counsel took ample advantage of his remedy to this situation: on cross-examination he thoroughly explored Iandoli's exposure to the press and the consequent reliability of his identification.

at the probable cause hearing. See *Moore v. Illinois*, 434 U.S. 220 (1977). Defense counsel used the opportunity to cross-examine the witness on the reliability of his identification. Further, as the defendant concedes, there is ample evidence to place him at the scene of the shooting: his wallet was found at the scene; he left the apartment accompanied by the two codefendants and returned with them; and he was arrested in possession of the weapons used to shoot Hanna as well as of Hanna's gun. There was no error in the denial of the motion to suppress the identification.

III. *Hearsay evidence.* At trial, Carmen Mangual testified as to the content of several statements that Rosado and Colon made to her while the three men were in the apartment. The defendant objected to this testimony as hearsay. The judge admitted the statements as part of the joint venture. There was no error.

It is well settled that out-of-court statements by joint criminal venturers are admissible against the others if the statements are made "both during the pendency of the cooperative effort and in furtherance of its goal." *Commonwealth v. White*, 370 Mass. 703, 708-709 (1976), quoting *Commonwealth v. Pleasant*, 366 Mass. 100, 103-104 (1974). See *Commonwealth v. Bongarzone*, 390 Mass. 326, 340 (1983); *Commonwealth v. Borans*, 379 Mass. 117, 146 (1979). See also Proposed Mass. R. Evid. 801(d)(2)(E); Fed. R. Evid. 801(d)(2)(E). This exception to the hearsay rule does not apply after the criminal enterprise has ended, as where a joint venturer has been apprehended and imprisoned. See *Commonwealth v. Drew*, 397 Mass. 65, 71 (1986). At that point, the joint venturers no longer share the commonality of interests which is some assurance that their statements are reliable. *Bongarzone, supra* at 340.

Statements may be introduced under this exception only if the existence of the joint criminal venture is shown by some other evidence. *Bongarzone, supra* at 340. The judge need not make a preliminary finding that a joint criminal enterprise exists as a precondition to admitting the evidence. Evidence may be admitted subject to a later motion to strike if

the prosecution fails to show that the defendant was part of a joint enterprise. *Borans, supra* at 145 n.26. The eyewitness accounts of Richardson and Iandoli, the arrest of the defendant in the company of Rosado, the defendant's possession of Hanna's gun, and Mangual's testimony concerning the activities of the three men in the apartment are ample to permit a fact finder to infer that the joint venture existed.

The defendant argues that it was error to admit the statements made before the three men left the apartment because those statements were not made during the pendency of a common enterprise to murder. He protests that because the three men had not formulated a plan to murder at the time they left the apartment, statements made at that time are not admissible as part of a joint venture "murder" case. He further argues that, although the evidence may indicate a common enterprise to commit a robbery at that point, the declarations are nonetheless inadmissible because no robbery was committed and none of these defendants was charged with robbery. We do not agree. "The law and the evidence bring the case within the elementary proposition that, '[i]f a person combines and confederates with others to accomplish an illegal purpose, he is criminally liable for the acts of each and all who participate with him in the execution of the unlawful design. . . . [I]t was not essential that murder be a part of the original plan, if it was one of the probable consequences of the robbery which was intended to be effected by the use of a deadly weapon.' *Commonwealth* v. *Lussier*, 333 Mass. 83, 94 [1955], citing *Commonwealth* v. *Devereaux*, 256 Mass. 387, 395 [1926]. *Commonwealth* v. *Devlin*, 335 Mass. 555 [1957]." *Commonwealth* v. *Dellelo*, 349 Mass. 525, 531 (1965). See *Commonwealth* v. *Borans*, 379 Mass. 117, 149 (1979).[4]

The defendant also contends that the declarations made after the shooting are inadmissible because at that time any

_____

[4]The general rule that declarations by joint venturers are admissible against fellow venturers applies where a conspiracy or common enterprise is shown to exist even though it is not charged. *Commonwealth* v. *Flynn*, 362 Mass. 455, 477 (1972).

joint enterprise had terminated. The contention is without merit. When the three men returned to the apartment after the shooting, they were attempting actively to conceal evidence of the shooting and to avoid detection and detention. Colon and Rosado made their declarations to Mangual as part of their effort to enlist her aid in their concealment and escape. The interests of the three men still were closely bound together, tending to ensure the reliability of their statements. See *Bongarzone, supra* at 340. Cf. *Commonwealth* v. *Drew*, 397 Mass. 65, 71 (1986) (statement made after incarceration not admissible). The judge properly left the determination of a joint venture to the jury, and the defendant does not argue that these instructions were incorrect.[5] See *Commonwealth* v. *Andrews*, 403 Mass. 441, 453 (1988).

The defendant asserts that these statements were not properly admissible because, during part of the conversation, the defendant was silent and the statements were not vicarious admissions by silence. The short answer is that the statements were not admitted as admissions by silence. The judge clearly and unambiguously instructed the jurors that they were not to infer anything from the defendant's failure to respond to statements made in his presence. There is no reason to conclude that the jurors did not follow the judge's instructions. See *Commonwealth* v. *Clifford*, 374 Mass. 293, 298 (1978).

IV. *Defendant's motion for a required finding of not guilty.* At the close of the Commonwealth's case, the defendant moved for a required finding of not guilty. The judge denied the motion, and the defendant asserts denial of the motion was error. The standard of review for the denial of a

---

[5]Because we have decided that Mangual's statements properly were admitted under the joint venturers' exception to the hearsay rule, we do not discuss the Commonwealth's argument that some of the statements also are admissible as statements against penal interest. We also do not consider the Commonwealth's argument that Colon's statement that the men were going to "check the place out" also was admissible as a declaration as to state of mind.

directed verdict is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt" (emphasis in original). *Commonwealth* v. *Latimore*, 378 Mass. 671, 677 (1979), quoting *Jackson* v. *Virginia*, 443 U.S. 307, 318-319 (1979). Applying this standard, we hold that the evidence presented by the Commonwealth was sufficient to warrant submitting the case to the jury.[6]

The case was submitted to the jury on theories of extreme atrocity or cruelty and premeditated murder. The jury found the defendant guilty of murder in the first degree committed with extreme atrocity or cruelty. The defendant argues that there was insufficient evidence from which the jury could conclude that the defendant had the requisite malicious intent and there is no evidence that the defendant knew that the codefendants were armed. We do not agree.

The defendant contends that the evidence warrants only an inference that he shot Hanna in the thigh. He asserts that the victim died from the six .22 caliber gunshot wounds to the upper body and not from the .45 caliber shot to the thigh. He argues that the jurors could not find that he had a malicious intent because the weapon he used was not the fatal one. Therefore, he reasons, to submit the case against him to the jury, the Commonwealth had to offer evidence of his knowledge that the codefendants were armed prior to the shooting. He concludes that there was no evidence to support a conclusion he knew the codefendants were armed. Therefore, the defendant contends that the motion for required finding of not guilty should have been allowed.

The defendant is simply wrong in suggesting that, to infer intent from the intentional use of a *dangerous* weapon, the weapon must be the cause of the *fatal* wound. There is ample evidence from which the jury could have concluded that the

---

[6]The evidence presented at this trial is, in large part, identical to the evidence summarized in the codefendants' cases, *Commonwealth* v. *Colon*, *ante* 419, 420-423 (1990); *Commonwealth* vs. *Rosado*, *post* 561, 562-563 (1990).

defendant used a dangerous weapon — a .45 caliber Colt pistol — to shoot the victim in the thigh. That evidence is sufficient to support an inference of malice, without proof that the .45 caliber wound was, in fact, a fatal wound.[7] "Malice aforethought is a term of art which includes any intent to inflict injury without legal excuse or palliation . . . . An intention to inflict injury on the victim which is not justified on any lawful ground or palliated by the existence of any mitigating circumstances is malicious within the meaning of the law." (Citations omitted.) *Commonwealth* v. *McGuirk*, 376 Mass. 338, 345 (1978), cert. denied, 439 U.S. 1120 (1979).

Furthermore, although it was not necessary to prove, there was sufficient evidence from which the jury could have inferred that the defendant knew the codefendants were armed. The evidence and the reasonable inferences therefrom permitted the jurors to infer that the defendant left the house with the two codefendants; that he was at the scene of the murder with them where at least two guns were used; that he heard Rosado say that they were going to have to shoot the victim because he (Hanna) was going to find the guns; and later this defendant was apprehended in the possession of four guns, including the two guns used on Hanna and Hanna's gun. The flaw in the defendant's argument is that the jurors could conclude that he had knowledge of the weapons from the totality of the circumstances. See *Commonwealth* v. *Giang*, 402 Mass. 604, 608-609 (1988); *Commonwealth* v. *Longo*, 402 Mass. 482, 487 (1988). Contrary to the defendant's implication, the jurors were not limited to

---

[7]Moreover, there was evidence presented at trial from which the jury could have concluded that the thigh wound *was* fatal, because the pathologist testified that *each* of the seven wounds was potentially fatal. The defendant, however, would have required the jury to combine that testimony with the pathologist's later testimony that the cause of death was a series of injuries to internal organs in the upper body and to conclude that the thigh wound was not fatal. The jury, of course, need not do so. They are free to accept or reject portions of any witness's testimony. See *Commonwealth* v. *Holiday*, 349 Mass. 126, 129 (1965). They could have concluded on this evidence that the thigh wound also was fatal.

one isolated moment at the time of the shooting to make their determination of the defendant's knowledge.

There also was ample evidence from which to draw the conclusion that the defendant was involved in a joint venture.[8] There was evidence that the defendant participated with Colon and Rosado throughout the evening. There is no evidence that he sought to remove himself from the joint venture. See, e.g., *Commonwealth v. Dellelo*, 349 Mass. 525, 529-531 (1965). The jurors could have concluded that the defendant furthered the purposes of the joint venture by inflicting the wound to the victim's thigh and shooting the patrol car tire to ensure that the three men would escape. The defendant remained with Rosado that evening. He had four weapons with him when arrested, including the weapons used to shoot Hanna and Hanna's gun. From the totality of the circumstances, the jury could have concluded that the defendant was "more than a mere onlooker." *Commonwealth v. Soares*, 377 Mass. 461, 472, cert. denied, 444 U.S. 881 (1979).

V. *Relief pursuant to G. L. c. 278, § 33E*. The defendant raises a number of issues pursuant to G. L. c. 278, § 33E, which he claims created a substantial likelihood of a miscarriage of justice, and require a new trial.[9] We do not agree. We turn briefly to those issues.

---

[8]The defendant points to *Commonwealth v. Fickett*, 403 Mass. 194 (1988), *Commonwealth v. Mandile*, 403 Mass. 93 (1988), and *Commonwealth v. Clark*, 363 Mass. 467 (1973), as cases in which we held the evidence of intent insufficient to find a defendant guilty of a joint venture murder. In none of those cases, however, was there evidence that the defendant himself was armed or that he committed violence against the victim or that he participated in the joint venture at all. His mere presence at the scene was not, we concluded, sufficient to convict. This case presents an entirely different set of facts, however, so that those cases are not on point.

[9]The defendant also asserts that failure of trial counsel to raise these issues at trial deprived him of the effective assistance of counsel. For the reasons stated in the opinion in this section, we reject the defendant's claim that he was denied the effective assistance of counsel for failure to raise these issues.

a. *Integrity of the grand jury.* The defendant argues that the Commonwealth impaired the integrity of the grand jury by offering unduly prejudicial evidence through the pathologist that Hanna was wearing a Saint Christopher's medal. He also contends that the police officer who read statements given by Figueroa and Mangual improperly editorialized on their truthfulness. Finally, the defendant charges that the Commonwealth withheld crucial evidence by failing to introduce additional statements by two of the witnesses that may have been exculpatory.

There was ample evidence before the grand jury to allege murder in the first degree. We "will not inquire into the competency or sufficiency of the evidence before the grand jury." *Commonwealth* v. *Galvin,* 323 Mass. 205, 211-212 (1948). See *Commonwealth* v. *Robinson,* 373 Mass. 591, 592 (1977). The grand jury is not a public forum and is not the appropriate forum for determining guilt or innocence. See *Commonwealth* v. *McNary,* 246 Mass. 46, 51 (1923).

The defendant asserts that the Commonwealth withheld additional statements by Mangual and Iandoli that contained some information that could be viewed as helpful to him. The omitted testimony did not "distort the meaning" of the evidence presented and did not turn an exculpatory statement into an admission by silence. Cf. *Commonwealth* v. *O'Dell,* 392 Mass. 445, 449 (1984).

b. *The Commonwealth's use of peremptory challenges.* The defendant contends that the Commonwealth systematically exercised its peremptory challenges to exclude potential jurors who were Hispanic, who had Hispanic surnames, or who were in some way affiliated with Hispanics.[10] Because the defendant is Hispanic and the victim a white police officer, this alleged use of peremptory challenges, he argues, denied him an impartial jury and created a risk that "the subtle group biases of the majority [were] permitted to oper-

---

[10]We note that the defendant's case did not raise questions of possible racial bias but rather ethnic bias, as we have held that the term "Hispanic" refers to an ethnic not racial group for purposes of jury empanelment. See *Commonwealth* v. *De La Cruz,* 405 Mass. 269, 274 (1989).

ate, while those of the minority [were] silenced." *Commonwealth* v. *Soares, supra* at 488. Consequently, he claims, the Commonwealth violated his rights to a trial by jury, to equal protection, and to due process secured under the Sixth and Fourteenth Amendments to the United States Constitution and art. 12 of the Declaration of Rights of the Massachusetts Constitution.

Because this issue was not raised at trial it is not properly before us. "A record in which a party has not had an opportunity to explain the use of peremptory challenges is inadequate to raise a *Soares* violation." *Commonwealth* v. *Bourgeois*, 391 Mass. 869, 877-878 (1984). We consider the record to determine if, on its face, it supports the defendant's claim. With regard to two Hispanic venire members challenged by the Commonwealth, the record reveals entirely plausible nondiscriminatory justifications for the challenges. One challenged juror expressed ambivalent feelings about police based on a poor police investigation of a missing relative. The other Hispanic juror challenged failed to disclose on his jury questionnaire his involvement as a defendant in an assault and battery case.

The defendant asserts that the Commonwealth improperly challenged two other members of the venire. These two persons, the defendant asserts, are Hispanic by virtue of their surnames. As to one of those persons, it is not clear whether the surname was hers or that of her former husband. Thus, the defendant has not established that this member of the venire is Hispanic. *Commonwealth* v. *Lattimore*, 396 Mass. 446, 447 n.3 (1985). The other member of the venire who was challenged by the Commonwealth worked for a publication which may have been covering the murder and subsequent trials.[11]

---

[11]The defendant asserts that other non-Hispanic persons were improperly challenged. *Soares*, however, applies to "peremptory challenges to exclude *members of discrete groups solely* on the basis of bias presumed to derive from that individual's membership in the group. . ." (emphasis supplied). *Commonwealth* v. *Soares, supra* at 488. We, therefore, do not discuss the defendant's wholesale attack on the use of peremptory challenges.

c. *Motion for change of venue.* Approximately a month prior to trial, the defendant moved for a change of venue based on the extensive publicity surrounding the death of Hanna. The trial judge took no action on the motion. Rather, the judge apparently decided to see whether an impartial jury could be empanelled. The defendant claims that failure to grant the motion deprived him of his right to a fair and impartial jury trial.[12]

A trial judge has substantial discretion in deciding whether to grant a motion for change of venue based on pretrial publicity. See *Commonwealth v. Bianco*, 388 Mass. 358, 367 (1983); *Commonwealth v. Blackburn*, 354 Mass. 200, 205 (1968). A trial judge should exercise his power to change the venue of a jury trial "with great caution and only after a solid foundation of fact has been first established." *Commonwealth v. Smith*, 357 Mass. 168, 173 (1970), quoting *Crocker v. Superior Court*, 208 Mass. 162, 180 (1911). The mere existence of pretrial publicity, even if it is extensive, does not constitute a foundation of fact sufficient to require a change of venue. See *Commonwealth v. Jackson*, 388 Mass. 98, 108 (1983); *Smith, supra; Blackburn, supra.* A defendant's right to a fair and impartial jury does not require that jury members have no prior knowledge of the crime. *Jackson, supra* at 108, citing *Dobbert v. Florida*, 432 U.S. 282, 302-303 (1977). *Blackburn, supra* at 204. The record in this case contains no indication that the jury members were less than fair and impartial. The judge is entitled to accept declarations of the jurors of their own disinterest. *Commonwealth v. Bianco, supra* at 368. *Commonwealth v. Gilday*, 367 Mass. 474, 492 (1975). The failure to grant a change of venue did not result in a substantial risk of a miscarriage of justice.

The defendant lays particular emphasis on the timing of some of the publicity. He alleges that media attention to the

---

[12]The defendant did not make a pretrial objection to the judge's failure to grant the motion, nor did he later renew the motion. We therefore consider that issue pursuant to G. L. c. 278, § 33E.

trial and conviction of codefendant Colon in the weeks before his own trial increased the possibility of prejudice in the minds of the jurors. The trial judge was well aware of the potential for such prejudice among the jurors, and therefore he examined the jurors individually. Contrary to traditional practice, the judge also permitted defense counsel and the prosecutor to examine the jurors individually. In light of the careful steps taken by the trial judge, we conclude that there was no substantial risk of a miscarriage of justice.

d. *Failure to conduct a colloquy.* The defendant argues that the judge should have conducted a colloquy with the defendant before examining prospective jurors for ethnic bias. But see *Commonwealth* v. *De La Cruz*, 405 Mass. 269 (1989). After the briefs were filed, we eliminated the requirement of a colloquy. *Commonwealth* v. *Ramirez*, 407 Mass. 553, 557 (1990).

e. *Mangual's plea agreement.* In a companion case, *Commonwealth* v. *Colon*, *ante* 419 (1990), we examined this same plea agreement between Carmen Mangual and the Commonwealth. We emphasized there that "[t]he established safeguards of the Anglo-American legal system leave the veracity of a witness to be tested by cross-examination, and the credibility of his testimony to be determined by a properly instructed jury." *Colon*, *supra* at 443, quoting *Hoffa* v. *United States*, 385 U.S. 293, 311 (1966). We concluded that in the circumstances of that case, these dual safeguards had been effective. Pursuant to our duty under G. L. c. 278, § 33E, we again conclude that there was no substantial likelihood of a miscarriage of justice.

The jury had ample opportunity to consider and weigh Mangual's veracity. The agreement in question was introduced in evidence at the very beginning of direct examination, so that the jury immediately was put on notice that she had some incentive to testify in a particular way. The judge instructed the jury between direct and cross-examination that they were to use the agreement in assessing Mangual's credibility. Defense counsel fully exploited his opportunity to attack her testimony on cross-examination by exploring the

details of the charges against her, the benefits she had received already and would receive in the future in return for her testimony, and the inconsistencies between her earlier statements and her testimony at trial. He reemphasized these points in his closing argument. The judge instructed the jury that they could consider the inducements offered to a witness in assessing credibility. The defendant was not denied his right to confront the witness.

Although we conclude that there is no substantial likelihood of a miscarriage of justice, we do not condone the use of agreements which do not require a witness to tell the truth. Such agreements are antithetical to the fair administration of justice. We reiterate our suggestion made in *Colon*, *supra* at 445, that future plea agreements be drafted so as to make the obligation to testify truthfully clear to the witness, and that those agreements be handled subsequently as we directed in *Commonwealth* v. *Ciampa*, 406 Mass. 257 (1989).

f. *Prosecutor's closing argument.* The defendant alleges that in his closing argument the prosecutor referred to facts not in evidence and engaged in inflammatory tactics by appealing to the jurors' sympathy and emotions. He asks that his conviction be reversed and the indictment against him be dismissed. Our review of the prosecutor's closing argument convinces us that it was within the bounds of propriety.

In examining remarks made during closing arguments for overreaching, this court considers the remarks in the context of the entire argument, and in light of the judge's instruction to the jury, and the evidence at trial. *Commonwealth* v. *Yesilciman*, 406 Mass. 736, 746 (1990). *Commonwealth* v. *Lamrini*, 392 Mass. 427, 432 (1984). "The prosecutor is entitled to argue the evidence and fair inferences to be drawn therefrom." *Commonwealth* v. *Paradise*, 405 Mass. 141, 152 (1989). *Lamrini, supra* at 431. Counsel may attempt to assist the jurors in analyzing the evidence by suggesting what conclusions they should draw from the evidence. *Lamrini, supra* at 431. *Commonwealth* v. *Ferreira*, 381 Mass. 306, 316 (1980).

The defendant contends first that the prosecutor's statement that the three men left the apartment with three guns was wholly unsupported by the evidence. As we noted earlier, there was adequate circumstantial evidence to permit such an inference. The defendant also objects on the same ground to the prosecutor's statement that one of the three men held the trooper down while another shot him in the back. The evidence indicates that there were four entrance wounds in his back and several abrasion marks. There was evidence of the men struggling with Hanna. The prosecutor's statement did not exceed the bounds of a fair inference from the evidence presented. Defense counsel's objection to the prosecutor's suggestion that the defendant may have delivered the fatal .22 shots is without merit. The prosecutor correctly referred to evidence that all three men at the scene were active participants in the events surrounding the shooting. He then pointed out that *if* the defendant was not the individual who carried the .45 and shot the cruiser's tire, then he might have been the one who fired the .22.

The defendant objects to the prosecutor's repeated references to what "they" did rather than what the defendant did. These remarks were a function of the prosecution's theory of the case, which was a joint venture. The actions and intentions of the other men were highly relevant to the innocence or guilt of the defendant. Finally, the defendant contends that the prosecution made a calculated appeal to prejudice by telling the jury that they had the "awesome responsibility of announcing in this courtroom what the truth is" and that they stood "in this courtroom . . . between law and lawlessness." These remarks bear no resemblance to other comments we have held to be calculated to appeal to prejudice. See *Commonwealth* v. *Clary*, 388 Mass. 583, 592 (1983) (characterization of defendant as a lesbian where no evidence of a lesbian relationship was offered at trial). See also *Commonwealth* v. *Graziano*, 368 Mass. 325, 332 (1975) (repeated references to "the godfather" in a trial of Italian defendants). There was no error.

g. *The jury instructions.* The defendant alleges error in the judge's charge to the jury that he claims entitles him to a new trial. The defendant makes two separate allegations of error. First he claims that the instructions permitted the jury improperly to impute to the defendant knowledge that the codefendants were armed. His argument appears to be that the judge's instruction on inferring malice from the intentional use of a dangerous weapon, coupled with his direction that if the jury found a joint venture then they could attribute the acts and statements of each joint venturer to each of the others, allowed the jury to impute Colon's and Rosado's knowledge that they were armed to the defendant. He complains that the "trial court's combined instructions on joint venture and intentional use of a dangerous weapon drew no distinction between the possible consequences of a finding that the defendant did not know that either of the codefendants was armed with the fatal weapon but that he used the .45 caliber weapon."

Contrary to the defendant's assertions, the jurors were told that they had to find that *this* defendant had malice aforethought before they could find a joint venture and begin attributing statements and actions between codefendants. It was not necessary that the jury be given instructions regarding the defendant's knowledge that the codefendants were armed because such knowledge was not essential to proof of the crime charged.[13] We therefore must reject the defendants' first argument regarding the judge's instructions.

The defendant's second allegation of error is that the instructions unduly prejudiced the jury. He points to various statements by the judge that he claims constituted an imper-

---

[13]The defendant cites *Commonwealth* v. *Watson*, 388 Mass. 536 (1983), with regard to the judge's failure to instruct regarding the knowledge of the others' possession of guns. That case, however, dealt with a felony-murder charge. Because the requisite intent in felony-murder cases is the intent to commit the underlying felony, the knowledge that the other was armed was required as an element of the felony of armed robbery and consequently as an element of felony-murder. See *Commonwealth* v. *Ferguson*, 365 Mass. 1, 8 (1974).

missible expression of the judge's own view of the case. Taken as a whole, however, the instructions did not convey the judge's view of the case to the jurors. The judge told the jurors that "[a] joint venture or a common enterprise occurs when two or more persons act together in order to commit a crime or a series of crimes — in this case, it obviously would be a crime — one crime." As we read the instruction, the judge was not commenting on the sufficiency of the proof that the defendant had committed a crime. Rather, he was trying to make clear that only a single crime, not a series of crimes, was involved in the allegation of joint venture. The "obviously" referred to the singularity of the crime, not the fact of the crime.

Similarly, when the judge instructed that "direct evidence is when a witness can be brought to this courtroom to testify to the precise fact and issue, and in this case, quite obviously, it's a homicide; it's a murder, allegedly . . . ," the "quite obviously" referred to the type of crime in issue, not the fact that a homicide had been committed. The judge's subsequent modification of the word "murder" with "allegedly" supports this interpretation.

Finally, the judge told the jury that "quite obviously in this case it would be fair to say that the Government's case presented to you consists of what you might describe as circumstantial evidence," and later that "you should not in any way draw some conclusion that circumstantial evidence is some sort of inferior evidence, because quite obviously that isn't so." This accurate instruction on the law, emphasized by the phrase "quite obviously" (a phrase whose force may have been diluted in these circumstances through frequent repetition), did not, taken in the context of the whole instructions, risk such a bias that there is a substantial likelihood that justice miscarried.

"[T]he adequacy of instructions must be determined in light of their over-all impact on the jury." *Commonwealth* v. *Signorine*, 404 Mass. 400, 409 (1989), quoting *Commonwealth* v. *Callahan*, 401 Mass. 627, 631 (1988). Further, the absence of any objection at trial is a relevant consideration.

See *Commonwealth* v. *Tavares*, 385 Mass. 140, 148 (1982). As we read the instructions, the defendant's interpretation of them is strained, at best. In the context of the over-all charge, any misinterpretation that may be conceivable when the statements are read in isolation is too remote a possibility to constitute a substantial likelihood that justice miscarried.

h. *Jury determination of the degree of murder.* The defendant claims on appeal that the judge committed reversible error when he allowed the jury to consider the issue of extreme atrocity or cruelty, and thus to decide the defendant's degree of guilt. This issue properly was submitted to the jury.

General Laws c. 265, § 1 (1988 ed.), states explicitly that "[t]he degree of murder shall be found by the jury." This court has confirmed repeatedly that the question of extreme cruelty or atrocity is to be decided by the jury, as long as there is some basis in the evidence which could justify such a determination. *Commonwealth* v. *Merola*, 405 Mass. 529, 548 (1989). *Commonwealth* v. *Freiberg*, 405 Mass. 282, 290 (1989). *Commonwealth* v. *Connolly*, 356 Mass. 617, 628, cert. denied, 400 U.S. 843 (1970). See *Commonwealth* v. *Glass*, 401 Mass. 799, 802-803 (1988). We recently have held that "it is [not] constitutionally improper to permit a jury, in effect, to decide an aspect of a murderer's sentence by determining the degree of atrocity or cruelty in the murderer's conduct, at least where the possibility of a sentence of death is not at issue." *Commonwealth* v. *Freiberg*, *supra* at 290, quoting *Commonwealth* v. *Glass*, *supra* at 805. We are not inclined to a different view.

i. *Ineffective assistance of counsel.* The defendant filed a second motion for a new trial along with his appellate brief. A single justice of this court remanded the motion to the trial judge for consideration. The trial judge denied it, ruling that the issues raised had been waived, and if not waived, were without merit.

The motion alleges that the defendant's Sixth and Fourteenth Amendment rights to effective assistance of counsel were denied, on several different grounds. Our approach to ineffective assistance of counsel cases in which the issue has

not been waived is to require that there "be some showing that better work might have accomplished something material for the defense." *Commonwealth v. Satterfield*, 373 Mass. 109, 115 (1977). We have considered most of the defendant's arguments raised in the motion for new trial pursuant to G. L. c. 278, § 33E. See *supra*.

The defendant raises two instances of alleged inadequate performance by the trial counsel, the substance of which we have not yet considered. First, he contends that the attorney should have introduced certain omitted portions of Mangual's statements to the police. In those omitted portions, Mangual stated that the defendant had been initially reluctant to leave the apartment with Rosado and Colon, and that when he left he said that they were not going to do anything. Rosado appeared to be the ringleader of the three codefendants. Although these additional statements may have been helpful to the defendant, in light of the substantial body of incriminating evidence introduced by the Commonwealth, their introduction was unlikely to have "significantly bolstered" his defense. *Commonwealth v. Brady*, 380 Mass. 44, 56 (1980).[14]

The defendant also asserts that he was deprived of effective assistance because trial counsel failed to seek an instruction on assault and battery by means of a dangerous weapon. Building upon his argument, which we previously rejected, that there was insufficient evidence to prove that he had the requisite malice aforethought for murder, he claims that

---

[14]The defendant also makes an argument — without support or references to the record — that counsel should have objected to Sergeant Joseph Doheny's testimony "that he assigned people to listen to Carmen Mangual to see if she was telling the truth." He claims that Doheny's opinion about Mangual's credibility was of no relevance. That issue is deemed waived. See *Commonwealth v. Cundriff*, 382 Mass. 137, 151 n.22 (1980).

Even if the sergeant's testimony was not relevant, a question we do not reach, we see no prejudice to the defendant's case arising out of counsel's failure to object. If anything, creating a doubt in the jurors' minds as to Mangual's credibility helped the defendant, especially if, as the defendant claims, her testimony was so important to the Commonwealth's case. Thus, the failure to object did not deprive him of a substantial defense.

counsel should have requested instructions on the lesser included offense.

There is no substantial likelihood of a miscarriage of justice because no prejudice resulted to the defendant from the lack of an instruction on assault and battery by means of a dangerous weapon. See *Commonwealth v. Gregory*, 401 Mass. 437, 445 (1988) (rejecting defendant's ineffective assistance argument in the absence of a showing of prejudice); *Satterfield, supra* at 115. The jurors were instructed correctly on malice aforethought. Because the jurors found the defendant guilty of murder in the first degree, the jurors must have concluded that he *did* possess the requisite malice aforethought and determined the existence of a joint venture. The evidence was more than sufficient to support the jury's conclusions. Therefore, there was no prejudice.

VI. *The denial of the defendant's motion for a new trial.* The defendant contends that the trial judge abused his discretion in denying the defendant's motion for a new trial without an evidentiary hearing. We disagree.

The defendant in his motion claims that the jury was exposed to improper outside influences during deliberation due to "the Commonwealth's arrangement to have state troopers in the court room" after the jurors received further instructions from the court. The troopers' presence, according to the defendant, produced a "totalitarian atmosphere" in the courtroom, exerting undue influence on the jury.

The defendant did not object to the troopers' presence at the time of trial. We have said that a motion for a new trial should not be used to revive issues that have been waived by the parties except in "extraordinary cases where, upon sober reflection, it appears that a miscarriage of justice might otherwise result." *Commonwealth v. Harrington*, 379 Mass. 446, 449 (1980). Moreover, we have directed trial judges, in deciding whether a "substantial issue is raised" under Mass. R. Crim. P. 30 (c) (3), 378 Mass. 901 (1979), to consider both the seriousness of the issue and the adequacy of the defendant's showing on it. See *Commonwealth v. Stewart*, 383 Mass. 253, 257-258 (1981). The judge in this trial would

have been well within his discretion to decide that there was no possibility of a miscarriage of justice that would justify the revival of a waived issue. He likewise could have appropriately decided that the possibility of prejudice from the troopers' presence was too remote to warrant an evidentiary hearing. The denial of the motion was not error.

VII. *Conclusion.* We have considered the evidence and the record pursuant to G. L. c. 278, § 33E, and conclude that there is no reason for us to enter a verdict of a lesser degree of guilt or to order a new trial.

*Judgment affirmed.*