OPINION
Defendant-appellant, Tinotchy Ward, appeals his convictions for aggravated murder and aggravated burglary. Appellant claims that certain evidence should have been suppressed at his trial and that his convictions were against the manifest weight of the evidence. We find none of appellant's contentions to be persuasive and affirm his convictions.
On November 25, 1998, appellant was indicted on two counts of aggravated murder (count one alleging murder while committing or attempting to commit aggravated robbery and count two alleging murder with prior calculation and design), each containing a death penalty specification, and one count of aggravated robbery. All three counts contained a gun specification. The indictment arose out of the November 26, 1997 robbery and shooting death of Renold Williams, an armored truck guard who was delivering money to the National City Bank in Bexley, Ohio.[1] Mr. Williams died as a result of a single gunshot to the chest as he was entering the bank. The assailant took a bag of money and deposits from Mr. Williams after shooting him.
At trial, the prosecution's evidence against appellant was extensive, consisting principally of the testimony of three eyewitnesses who identified appellant as the offender, physical evidence seized in a search of appellant's residence, and statements made by appellant to his live-in girlfriend after the crime.
In particular, an eyewitness, Lowell Shoaf, testified that, on November 26, 1997, he was stopped in his car at the traffic light at the corner of Main Street and Remington Road in Bexley heading east. He heard a single gunshot and immediately looked to his left, the direction of the gunshot sound. Mr. Shoaf saw a man in uniform slumping down on the sidewalk in front of the bank and another man (the assailant) running away to the west with a bag in one hand and a handgun in the other hand. The assailant got into the passenger side of a blue car parked on Remington pointed north, which car immediately proceeded north on Remington. Mr. Shoaf then followed the getaway car for a period of time until he lost sight of the vehicle near Broad Street. Mr. Shoaf described the assailant as a black man wearing a stocking cap and dark clothing, mid-to-late twenties, slight build, 5'9" to 5'10" tall, with a medium complexion, a long triangular face, and large eyes. Appellant described the getaway car as a light blue, compact car "like a Ford Escort," five-to-ten-years old. Immediately after the incident, he thought he would be able to identify the assailant.
Mr. Shoaf further testified that while watching the television news in mid-December 1997, he saw a story in which the appellant was shown and identified as a suspect in the Bexley bank shooting. Mr. Shoaf immediately turned to his wife and stated to her, "[t]hat's him. He looks like the man that I saw running down the sidewalk." Mr. Shoaf then identified appellant in the courtroom as the shooter, stating that he was seventy-five percent to eighty percent sure.
Likewise, Gerald Hooffstetter, a letter carrier with the United States Postal Service, testified that shortly before 11:30 a.m. on November 26, 1997, he was stopped in his postal delivery truck at the traffic light at the corner of Main and Remington heading west in the curb lane. He heard a single loud noise and turned to his right, where he saw a black man with a pistol in his right hand and Mr. Williams lying in front of the doors of the bank. Hooffstetter then saw the assailant turn to his left, bend down and pick up a bag, and walk to a getaway vehicle parked on Remington heading north. Hooffstetter identified the getaway vehicle as a dark blue Ford Escort.
Later, in December, Hooffstetter also saw a television newscast in which appellant was shown and identified as a suspect in the crime. Hooffstetter immediately recognized appellant as the shooter, told his wife that it was him, and immediately called the FBI. Hooffstetter then identified appellant in the courtroom, stating he had no doubt that appellant was the shooter.
The last eyewitness to identify appellant at trial was Joanne Ward (no relation to appellant), who testified that, at approximately 11:30 a.m., on November 26, 1997, she was leaving the National City Bank in Bexley. She was about to open the glass door to the outside when she heard a gunshot, looked up, and saw appellant through the door bend over, grab a money bag from the ground, and take off. She also saw Mr. Williams slide down the outside wall of the bank entrance. Ms. Ward identified appellant in the courtroom as the shooter, stating that she was positive. Finally, Ms. Ward testified that she had also seen appellant on the news in December and that she told her husband at that time that she recognized appellant as the man that shot Mr. Williams.
Shemeka Williams, appellant's girlfriend in November 1997 (and no relation to the victim), also testified on behalf of the state. In particular, Ms. Williams testified: (1) that she and her two children lived with appellant in late 1997; (2) that appellant owned two cars, a black Ford Bronco and a blue Ford Escort; (3) that on November 26, 1997, appellant left the house early in the morning wearing a blue hooded sweatshirt, jeans, boots, and a black stocking cap; (4) that he left driving the Ford Escort; (5) that appellant returned to the house a little after noon and immediately turned on the television news; (4) that when the story about the bank robbery was broadcast, appellant told her that he had done it; (6) that appellant later told her that he shot Mr. Williams because he pulled his gun on the appellant; (7) that appellant owned a black, automatic pistol; (8) that appellant made the Escort look like it had not been driven in a while by breaking the windshield and removing air from at least one of the tires; (9) that appellant told her he only got $2,000 from the robbery and had to split it with his accomplice; and (10) that appellant threatened to kill her if she told anyone. Ms. Williams further testified that, on December 18, 1997, she and appellant fought, that he again threatened her, and that she fled the house and called the police. Ms. Williams then informed the police of appellant's statements concerning his involvement in the robbery and shooting of Mr. Williams.
The prosecution also presented evidence concerning appellant's ownership of a blue Ford Escort, including photographs taken of the vehicle found at appellant's residence. Other physical items seized from appellant's residence were also introduced including several black knit caps, a black hooded sweatshirt, a black down jacket, and one spent 9mm shell casing. Finally, the state presented expert testimony that the spent 9mm shell casing found at the residence was fired by the same handgun used to fire the spent 9mm shell casing found at the scene of the crime.
Appellant presented no evidence in his defense.
On January 27, 2000, the jury found appellant guilty of aggravated murder with the death penalty specification and found the appellant guilty of aggravated robbery. On February 2, 2000, after a mitigation hearing, the jury recommended a sentence of life imprisonment without parole. By judgment entry filed February 4, 2000, the trial court sentenced appellant accordingly.
It is from this judgment entry of conviction that appellant appeals raising the following three assignments of error:
 Assignment of Error No. 1: A trial court commits reversible error when it overrules defendant's motion to suppress evidence of identification where the witnesses' identifications result from viewing televised newscasts.
 Assignment of Error No. 2: A trial court commits reversible error when it overrules defendant's motion to suppress defective search warrants.
 Assignment of Error No. 3: Appellant's conviction is against the manifest weight of the evidence.
In his first assignment of error, appellant contends that the trial court erred in failing to suppress the in-court identifications of him as the shooter by the three eyewitnesses. As noted above, all three of the witnesses identified appellant only after seeing him on television newscasts in December 1997, in which appellant was described as a suspect in the crime. According to appellant, the witnesses' identifications were tainted by the news reports and, as such, should have been suppressed under the due process guarantees of the Fourteenth Amendment to the United States Constitution.
Under the Due Process Clause of the United States Constitution, where a witness has been confronted by a suspect before trial, that witness's identification of the suspect will be suppressed if the prior confrontation procedure was unnecessarily suggestive of the suspect's guilt and the identification was unreliable under the totality of the circumstances. See Manson v. Brathwaite (1977), 432 U.S. 98. The rationale for excluding a tainted identification, however, is to protect a defendant from misconduct by the state and, as such, due process guarantees are not implicated absent state involvement contributing to the witness's pretrial exposure to the defendant. State v. Brown (1988),38 Ohio St.3d 305, 310-311.
The Ohio Supreme Court's analysis in Brown, supra, is particularly relevant here. In Brown, several witnesses were unable to initially identify the defendant from police photographs or in a line-up, but were able to identify the defendant at trial after seeing the defendant in the courthouse corridor or his photograph in a newspaper. The Ohio Supreme Court held that, where the pre-trial confrontation was accidental and no state action was involved, the alleged suggestiveness of the identifications went to the weight of the identifications rather than their admissibility. Id. at 310-311. Given that there was no state involvement in either the accidental confrontation in the hallway or exposure to the newspaper photograph, the identifications were properly admitted. Id; see, also, State v. Ball (Sept. 21, 2000), Franklin App. No. 99AP-1288, unreported (witness's chance meeting of defendant in courthouse hallway did not warrant exclusion of in-court identification); State v. Hall (June 3, 1998), Medina App. No. 2767-M, unreported (evidence that witness's identification of defendant may have been influenced by suggestions of parents did not render identification inadmissible).
Other Supreme Court decisions throughout this nation are in accord in upholding the admissibility of in-court identifications by witnesses exposed to media reports identifying the defendant as a suspect as long as there is no evidence suggesting that the actions of the police or the prosecution caused such exposure. See, e.g., State v. Gatone (R.I. 1997),698 A.2d 230, 238 (no state action in witness's exposure to newspaper photograph of defendant); Commonwealth v. Colon-Cruz (1990), 408 Mass. 533,542, 562 N.E.2d 797, 805 ("[i]f police have not in any way manipulated press reports, then simple exposure to the media is not sufficient ground to suppress an identification."); Norris v. State (1976), 265 Ind. 508,356 N.E.2d 204, 206 (witness's exposure to newspaper photograph "not engineered by prosecution or law enforcement agencies" did not warrant exclusion of in-court identification).
Here, as in Brown, supra, there was no evidence submitted at the suppression hearing or at the trial that the police contrived to have the witnesses exposed to media reports showing the appellant and identifying him as the suspect in the crime. There was no evidence that the police (or any arm of the state) leaked or disseminated information concerning appellant or his status as a suspect. Likewise, there was no evidence that any state actor encouraged or prompted the witnesses to view the newscasts in question. In fact, the evidence indicates that all three witnesses saw the newscasts by accident or as a result of their normal viewing routine. Simply put, appellant has failed to show any state action in the witnesses' exposure to appellant's photograph in the media reports. As such, the in-court identifications were properly admitted. Appellant's first assignment of error is not well-taken.
In his second assignment of error, appellant contends that the trial court erred in failing to exclude certain items and evidence seized pursuant to several search warrants obtained by the police officers during the investigation of this crime. In particular, appellant contends that the search warrants were obtained primarily upon hearsay statements of Shemeka Williams and, as such, the information was unreliable and insufficient to support a finding of probable cause as required by theFourth Amendment to the United States Constitution. In so doing, appellant relies upon United States Supreme Court cases discussing the use of unnamed informants to support a probable cause finding. See, e.g.,Illinois v. Gates (1983), 462 U.S. 213; Aguilar v. Texas (1964),378 U.S. 108; and Spinelli v. United States (1969), 393 U.S. 410. Appellant argues that, pursuant to these cases, the search warrants in this case should not have issued because the applications lacked sufficient information by which the court could judge the credibility of Shemeka Williams nor did they contain corroborating evidence affirming her credibility. We find appellant's argument in this regard unpersuasive.
First, there is nothing in the record supporting the basic foundation of appellant's argument — i.e., that the search warrants at issue in this case were obtained through the use of an unnamed informant. None of the applications for the warrants (or the warrants themselves) are part of the appellate record and, as such, the record fails to reflect the actual language used by the affiant, Bexley Police Detective Brian Holbrook, in support of the requested search warrants. Detective Holbrook's suppression hearing testimony, however, clearly indicates that he informed the issuing judge that he had probable cause based, in part, upon Shemeka Williams's statements that appellant confessed to her that he had committed the crime. In so doing, Holbrook named her in the applications for the search warrants and identified her as the appellant's live-in girlfriend. Given that Ms. Williams was named in the applications and the basis for her knowledge was placed in context before the issuing judge, appellant's reliance on cases discussing the unique difficulties involving unnamed informants is misplaced.
Moreover, as recognized by the Ohio Supreme Court, "[i]n reviewing the sufficiency of probable cause in an affidavit submitted in support of a search warrant issued by a magistrate, neither a trial court nor an appellate court should substitute its judgment for that of the magistrate by conducting a de novo determination as to whether the affidavit contains sufficient probable cause upon which that court would issue the search warrant." State v. George (1989), 45 Ohio St.3d 325, paragraph two of the syllabus. Rather, the trial and appellate courts must simply ensure that the magistrate had a substantial basis for its finding of probable cause and must accord great deference to the magistrate's decision. Id. Based on this record, we find no abuse of discretion in issuing the search warrants in this case. Appellant's second assignment of error is not well-taken.
In his third assignment of error, appellant contends that his convictions were against the manifest weight of the evidence. In particular, appellant argues that his convictions were based primarily upon the tainted in-court identifications by Ms. Ward, Mr. Hooffstetter, and Mr. Shoaf, and that absent their testimony, there is very little evidence connecting appellant to the crime. We disagree.
Even though supported by sufficient evidence, a conviction may still be reversed as being against the manifest weight of the evidence. State v.Thompkins (1997), 78 Ohio St.3d 380, 387. In so doing, the court of appeals sits as a "thirteenth juror" and after "`reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.'" Id., (quoting State v. Martin [1983], 20 Ohio App.3d 172,175); see, also, Columbus v. Henry (1995), 105 Ohio App.3d 545, 547-548. Reversing a conviction as being against the manifest weight of the evidence should be reserved for only the most "`exceptional case in which the evidence weighs heavily against the conviction.'" Thompkins, supra, at 387.
Here, the evidence clearly does not weigh heavily against the convictions. While appellant's argument as to the potential unreliability of a particular witness's in-court identification after seeing media reports identifying the appellant as a suspect is not without merit. This case involves three such witness, all of whom were subject to extensive direct and cross-examination on the issue. Each testified that they immediately recognized appellant upon seeing him on the television newscasts, that their in-court identification was based upon what they saw on the day of the crime and not what they saw in the media accounts, and that they were reasonably certain of their identifications. Nothing in the testimony of the three eyewitnesses is so incredible as to render appellant's convictions against the weight of the evidence. See State v.Harris (1991), 73 Ohio App.3d 57, 63 (even though there was reason to doubt the credibility of the prosecution's chief witness, he was not so unbelievable as to render verdict against the manifest weight).
Moreover, there was significantly more evidence than the three eyewitnesses' testimony connecting appellant to the crime. For example, appellant owned and possessed a blue Ford Escort matching the description of the getaway vehicle; appellant confessed to Shemeka Williams that he committed the crime; clothing (including several black knit caps) generally matching those described by the witnesses was found at the residence, and markings on a spent 9mm shell casing found at the residence matched those found on the spent 9mm shell casing found at the crime scene. Simply put, appellant's convictions were not against the manifest weight of the evidence. Appellant's third assignment of error is not well-taken.
For the foregoing reasons, all three of appellant's assignments of error are overruled and the judgment of the Franklin County Court of Common Pleas is affirmed.
BROWN and KENNEDY, JJ., concur.
[1] Count two was dismissed at the close of the state's case on appellant's Crim.R. 29 motion.