Commonwealth *v.* Morales.

## COMMONWEALTH *vs.* EDDIE MORALES.

Hampden. November 7, 2003. - December 11, 2003.

Present: GREANEY, SPINA, COWIN, SOSMAN, & CORDY, JJ.

*Practice, Criminal,* Venue, Empanelment of jury, Access to witnesses, Jury and jurors, Mistrial, Judicial discretion, Voir dire, Argument by prosecutor, Assistance of counsel, Capital case. *Constitutional Law,* Fair trial, Access to witness, Assistance of counsel. *Jury and Jurors. Witness,* Intimidation. *Evidence,* Consciousness of guilt, Relevancy and materiality. *Self-Defense.*

At the trial of an indictment for murder in the first degree, a Superior Court judge properly declined to order a change of venue due to pretrial publicity surrounding the victim's death, where the media coverage was not so inflamatory or sensational as to require a presumption of prejudice, and where the defendant did not meet his burden of showing that there was general and substantial prejudgment to such an extent that it was practically impossible to empanel an impartial jury [538-542]; likewise, the publicity did not actually deprive the defendant of his right to a fair trial, where the record contained no suggestion that the jury members were less than fair and impartial [542-543].

A criminal defendant failed to establish a claim that his ability to prepare and present his defense was hindered by the Commonwealth's alleged intimidation of a witness, where there was no showing that anything was lost to the defense as a result of the witness being reminded by police that he had missed an interview appointment with the district attorney's office while he was meeting defense investigators. [544]

A defendant charged with murder in the first degree was not denied a fair trial due to the publication of a photograph of a juror during the trial, where the defendant's argument that the photograph's publication subjected the juror to pressure to convict constituted baseless speculation. [544-545]

A Superior Court judge's refusal to grant a criminal defendant's request for a change in venue did not deprive the defendant of a fair trial, where the defendant had no basis for his argument that a juror's outward reactions to testimony distracted other jurors and resulted from pretrial publicity which would not have been encountered in another county. [545-546]

A criminal defendant's implicit admission and statement to his girl friend regarding retaliation against an informant were properly admitted in evidence as evidence of consciousness of guilt at the trial of an indictment for murder in the first degree, and the judge gave appropriate limiting instructions. [546-548]

This court concluded that there was no error in a Superior Court judge's denial of a criminal defendant's motion for a mistrial after a witness lost his composure and could not continue reading a statement, where the judge

instructed the prosecutor to "move on" to another subject and the prosecutor did so, and where the judge, who was in the best position to decide whether the incident was likely to prejudice the jury, determined that he did not believe the jury were affected by the witness' emotional display. [548]

Declining to question potential jurors on voir dire regarding their views on self-defense did not constitute an abuse of discretion on the part of a Superior Court judge at the trial of an indictment for murder in the first degree, where there was no reason to suspect juror prejudice against claims of self-defense and where the defendant failed to show a substantial risk of juror bias against such a defense. [548-549]

This court concluded that a Superior Court judge did not err in allowing a prosecutor to read to the jury part of a criminal defendant's statement to the police which the witness, who had lost his composure, could not continue reading, where the reading did not amount to the prosecutor vouching for the witness. [549]

A defense counsel's failure to move for a mistrial after a witness's inadvertent editorializing in response to a question did not constitute ineffective assistance of counsel creating a substantial likelihood of a miscarriage of justice, where the witness's answer was brief and was immediately struck by the judge, where counsel's strategy in not asking for a mistrial was not manifestly unreasonable, and where there was overwhelming evidence of the defendant's guilt. [549-550]

No substantial likelihood of a miscarriage of justice was created by a prosecutor's closing argument which permissibly suggested that the defendant's self-defense theory was a later contrivance, given the defendant's failure to indicate he had acted in self-defense in his lengthy, detailed statement to police. [550-551]

INDICTMENT found and returned in the Superior Court Department on January 26, 2000.

The case was tried before *C. Brian McDonald*, J.

*Janet Hetherwick Pumphrey* for the defendant.

*Marcia B. Julian*, Assistant District Attorney, for the Commonwealth.

COWIN, J. A jury convicted the defendant of murder in the first degree on grounds of deliberate premeditation and extreme atrocity or cruelty. On appeal, the defendant's primary claim is that the trial judge erred by declining to order a change of venue and that therefore he was denied his right to a jury of a fair and representative cross section of the community. The defendant further alleges a denial of his right to a fair trial due to witness intimidation, the publication of a photograph of the jurors, the behavior of a distracting juror, and the admission of

a statement that the defendant threatened to kill a witness as consciousness of guilt evidence. In addition, the defendant asserts that the judge erred in denying a motion for a mistrial due to a display of emotion by a Commonwealth witness. He also maintains that he was impaired in presenting his defense of self-defense by the judge's refusal to ask a voir dire question about self-defense; by the prosecutor's "vouching for a witness" by reading excerpts of the defendant's statement to the police; and by his counsel's ineffectiveness in failing to move for a mistrial when a witness testified that the victim had "no chance to react." He also claims error in the prosecutor's closing argument. Finally, the defendant requests that this court exercise its power under G. L. c. 278, § 33E, to order a new trial or grant other relief. We reject these contentions, affirm the defendant's conviction, and also conclude there is no basis to exercise our power pursuant to G. L. c. 278, § 33E.

*Facts.* The jury could have found the following facts. John DiNapoli, the victim, was a twenty-three year veteran of the Holyoke police force. On the morning of December 22, 1999, while driving in an unmarked police cruiser, DiNapoli heard a radio dispatch reporting a fight at the corner of Sargent and Walnut Streets. Unarmed and in plain clothes, he transmitted to the dispatcher that he would "see what was going on." On arriving at the scene, he saw the defendant, whose appearance matched the dispatcher's description of one of the men involved in the altercation. As the defendant fled on foot, DiNapoli gave chase in the cruiser. At some point, the defendant stopped running and began firing a gun at the cruiser. DiNapoli put the cruiser in reverse and slowly backed away, but the defendant pursued the vehicle and continued to fire. DiNapoli had been shot five times and could not be resuscitated by paramedics who were called to the scene. (There were ten bullet holes in DiNapoli's vehicle.) The defendant fled, discarded his gun, and managed to make his way to Scranton, Pennsylvania, where he was apprehended by local police on December 27, 1999, and confessed to them that he had shot Officer DiNapoli. Massachusetts State police traveled to Pennsylvania and the defendant also gave a statement to them.

1. *Change of venue.* Because of the extensive publicity sur-

rounding the killing of Officer DiNapoli and the capture of the defendant, the defendant moved for a change of venue. See Mass. Crim. P. 37 (b), 378 Mass. 914 (1979). The motion was denied after a hearing and again denied after reconsideration. The defendant claims that failure to grant a change of venue deprived him of his constitutional right to a trial by an impartial jury. The following background is useful in assessing this challenge.

The bulk of the publicity cited by the defendant to support his motion was printed in the Springfield Union-News, a daily newspaper in Hampden County, which reached approximately 136,000 readers. Starting the day after the shooting, the Union-News published stories about DiNapoli, about the defendant's flight and capture, and about public reaction to the shooting. On December 27, 1999, the date of the defendant's arrest, one article reported that an attendee at DiNapoli's wake said that "it was the first time they heard people shouting hooray in a funeral home." Another story the same day reported that "[h]undreds of people" waited outside in the cold to pay their respects to DiNapoli. Subsequent articles in December, 1999, referred to the defendant's confession and prior criminal history. In January, 2000, Union-News stories detailed the establishment of a memorial fund in DiNapoli's honor and the expected passage of a Holyoke city council ordinance which called for affixing "WWJDD" decals ("What would John DiNapoli do") on all police cruisers. Follow-up stories about DiNapoli's family and posthumous honors appeared in the Union-News at least until July, 2000, and news about the defendant also received continuing coverage. The defendant further cited over one dozen stories about DiNapoli's death in the Boston Globe and Boston Herald including a December 30, 1999, Herald report bearing the headline: "DA: Suspect knew DiNapoli was a cop." In addition, the defendant points to media coverage in the Telegram & Gazette (a newspaper in the adjacent county of Worcester with a circulation of 147,000), television reports (including a local broadcast of DiNapoli's funeral), and a "web board," on which readers posted comments such as "He is Puerto Rican Trash" and "I actually hope he gets off . . . so he can get what he really and truly deserves, AN AUTOPSY."

As a result of this publicity, the vast majority of the venire was aware to some extent of the events surrounding DiNapoli's death. Of the sixteen jurors eventually empanelled, all knew about his death and all but one explicitly stated that they had received at least some of their information from the extensive media coverage.

The defendant maintains that he was denied his right to a fair trial because we should presume that the venire were so prejudiced by the pretrial publicity that it was impossible to empanel an impartial jury. See, e.g., *Sheppard* v. *Maxwell*, 384 U.S. 333 (1966); *Rideau* v. *Louisiana*, 373 U.S. 723 (1963). He bases this "presumptive prejudice" claim on the alleged "pervasive" and "inflammatory" media coverage to which the entire venire was exposed and the fact that, according to him, fifty-seven per cent of the jurors were excused for cause. Two factors create this presumption of prejudice. First, "the publicity must be both extensive *and* sensational . . . . If the media coverage is factual as opposed to inflammatory or sensational, this undermines any claim for a presumption of prejudice" (emphasis in original). *United States* v. *Angiulo*, 897 F.2d 1169, 1181 (1st Cir.), cert. denied sub nom. *Granito* v. *United States*, 498 U.S. 845 (1990). We have reviewed the record submitted by the defendant in support of his motion for a change of venue and we find the media coverage not so inflammatory or sensational as to require a presumption of prejudice. See *id.* Cf. *Rideau* v. *Louisiana, supra* (film of defendant's detailed twenty-minute confession to murder repeatedly televised by local station). Although we find the media coverage was extensive, it was primarily factual, summarizing the incident, the charges against the defendant, and his arrest in Pennsylvania. The coverage frequently did mention the defendant's confession, his criminal record, and the fact of the victim's twenty-one year service as a police officer, his popularity in the community, and the memorials in his honor. These references, however, are "significantly short of the type of emotionally charged, inflammatory, sensationalistic coverage needed to support a presumption of prejudice." See *United States* v. *Angiulo, supra* (no presumption of prejudice from frequent references to "reputed crime figure Genaro Angiulo," "mafia boss Angiulo," or

"reputed leader of Boston underworld"). Further, the majority of the articles that contained emotional material appeared in the immediate aftermath of the murder while empanelment did not start until about fourteen months later. By that time, reporting on the subject had decreased and was more factually based. See *Delle Chiaie* v. *Commonwealth,* 367 Mass. 527, 532 (1975) (where no adverse publicity later than nine weeks prior to start of trial, court stated: "While it is true that many of the articles might well have been prejudicial if read and remembered by members of the jury, the petitioner has failed to establish this to be a fact"). The voir dire questioning of the jurors established that, while most jurors recalled media coverage of the murder and the defendant's arrest, very few in the venire appeared to have been exposed to more recent media coverage. This suggests that the intensity of the media coverage that existed in December, 1999, had dissipated over time.

A second factor that may support a presumption of prejudice is the difficulty in empanelling jurors who appear impartial. *United States* v. *Angiulo, supra* at 1181-1182. "Where a high percentage of the venire admits to a disqualifying prejudice, a court may properly question the remaining jurors' avowals of impartiality, and choose to presume prejudice." *Id.* Although the defendant here claims that almost sixty per cent of the venire was excused for "some ground of partiality," that is not the relevant inquiry. What is relevant is the percentage of the venire disqualified for cause due to prejudice from pretrial publicity. See *Commonwealth* v. *Clark,* 432 Mass. 1, 6 (2000). We have reviewed the record and only fourteen jurors,[1] or approximately twenty-five per cent of the venire, were disqualified for exposure to media coverage. (The remaining jurors excused for cause were excused for reasons such as feelings about police officers, relationship to victim, bias against a defendant who did not testify or present evidence, or general feelings about guns or drugs). We have previously rejected claims of presumptive

---

[1]The Commonwealth identifies twelve venirepersons as excused due to media exposure. Our review of the record indicates two others, no. 2-6 and no. 2-11 (both called on the second day of empanelment), who were excused due to media exposure. (The Commonwealth considered these two individuals as excused due to general fear or anxiety from being in court. Their fear or anxiety stemmed from media awareness of the crime and its aftermath.)

prejudice even though significantly higher percentages of prospective jurors have been excused at least in part due to prejudice from exposure to publicity about the case. See *id.* (approximately thirty-five per cent); *Commonwealth* v. *Angiulo*, 415 Mass. 502, 515 (1993) (no rational basis to conclude venire prejudiced where forty-two per cent of venire excused). "Given the varied reasons for the partiality, we cannot say that the raw number of disqualifications, in itself, causes us to question the impartiality of the qualified jurors." *Id.* at 516. The defendant has not met his burden of showing that there was general and substantial prejudgment to such an extent that "it was practically impossible to empanel an impartial jury." *Id.* at 516, quoting *Commonwealth* v. *Bonomi*, 335 Mass. 327, 333 (1957).[2]

Having determined that presumptive prejudice does not exist in this case, we turn to consider whether, in the totality of the circumstances, the publicity deprived the defendant of his right to a fair trial, e.g., whether actual prejudice has been shown. See *Delle Chiaie* v. *Commonwealth, supra* at 532. Trial judges should "exercise . . . discretion to change venue . . . 'with great caution and only after a solid foundation of fact has been first established.' " *Commonwealth* v. *James*, 424 Mass. 770, 775-776 (1997), quoting *Commonwealth* v. *Colon-Cruz*, 408 Mass. 533, 551 (1990). "The mere existence of pretrial publicity, even if it is extensive, does not constitute a foundation of fact sufficient to require a change of venue. . . . A defendant's right to a fair and impartial jury does not require that jury members have no prior knowledge of the crime." *Commonwealth* v. *Colon-Cruz, supra.* The record here contains no suggestion that the jury members were less than fair and impartial. The judge was well aware of the potential for prejudice in the minds of the jurors and proceeded with extreme

---

[2]The defendant claims that he was prejudiced by his counsel's "reluctant[] accept[ance]" of two jurors, and by the lack of minority representation on the venire. He claims that he would not have been so prejudiced had the venue been changed. These arguments are speculative, unsupported by citation to any authority, and do not rise to the level of appropriate appellate argument. See Mass. R. A. P. 16 (a) (4), as amended, 367 Mass. 921 (1975). Further, at the time jury selection was complete, the defendant had not used three of his peremptory challenges. See *Delle Chiaie* v. *Commonwealth*, 367 Mass. 527, 532 (1975). Nevertheless, we do consider these arguments pursuant to our obligation imposed by G. L. c. 278, § 33E. See *infra.*

caution to assure that the jurors selected were unswayed by any media publicity and were impartial. *Id.* He extensively probed the jurors to discern their exposure to the pretrial publicity, their knowledge of the murder and the defendant's arrest, whether they were emotionally affected by the crime, whether they had discussed the case or formed opinions, and whether they would be uncomfortable if the defendant were acquitted or affected if he did not testify or present evidence.[3] He asked further questions when a particular response indicated such was necessary or when counsel so requested. Only those jurors whose answers indicated their "disinterest and freedom from emotional or intellectual commitment" were seated. *Commonwealth* v. *James*, *supra* at 777, quoting *Commonwealth* v. *Bianco*, 388 Mass. 358, *S.C.*, 390 Mass. 254 (1983). "The judge is entitled to accept declarations of the jurors of their own disinterest." *Commonwealth* v. *Colon-Cruz*, *supra* at 551, and cases cited. Defense counsel's repeated expression that he was "satisfied" with each seated juror and his failure to exhaust his peremptory challenges further belies any claim of juror partiality. See *Delle Chiaie* v. *Commonwealth*, *supra.*

The defendant claims that, in the order denying the motion to change venue, the judge improperly considered that the "public interest in this case warrant[ed]" that the trial take place in Hampden County. This is not an appropriate factor in determining whether a change of venue should be ordered. However, in the same order, the judge recognized the requirement that an impartial jury had to be selected. Indeed, in the order, he did not preclude the possibility of a change in venue should it prove impossible to empanel an impartial jury. Moreover, the judge took an additional step to avoid media-induced juror bias by continuing the trial date for two and one-half months to reduce the effect of anticipated media attention on the anniversary of the officer's death. Given the thorough voir dire procedures employed here, and the assurances of impartiality stated by the chosen jurors, the defendant's right to a fair trial was not compromised.

---

[3]In addition, the judge asked the jurors about the source of any exposure to publicity, their knowledge of pretrial proceedings, whether they watched the televised funeral of the victim or had contributed to the funds developed in the victim's memory, and whether they could put aside anything they knew or heard outside of the evidence and consider only the evidence in the case.

We consider in turn each of the defendant's other claims that he was denied a fair trial.

2. *Witness intimidation.* During trial preparation, one witness, Jose Hernandez, overslept and missed an appointment for an interview at the district attorney's office. Police officers went to his home where coincidentally he was being interviewed by defense investigators. After reminding him of his missed appointment and of the fact that he could speak to the defense investigators or not, as he wished, the police left his home. Hernandez then stopped speaking with the defense investigators, made a subsequent appointment with them, and, about forty-five minutes later, left for the district attorney's office. A "couple of days" later, the defense investigators returned to Hernandez's apartment and completed their questioning of him. Although the defendant claims prejudice from this series of events, none has been established. Hernandez was ultimately interviewed by the defense investigators; there is no showing anything was lost to the defense as a result of the events; and the incident was fully explored by counsel on cross-examination of Hernandez. Thus, there is no evidence that the defendant's ability to prepare and present his defense was hindered by the Commonwealth. See *Commonwealth* v. *Rivera*, 424 Mass. 266, 269-270 (1997), cert. denied, 525 U.S. 934 (1998).

3. *Photograph of the jury.* Shortly after opening statements, the jury were taken on a view. Despite the judge's order that the media not photograph the jurors' faces during the view, juror no. 8 informed the judge that he had been recognized in a newspaper photograph.[4] He was questioned by the judge and reported no embarrassment or discomfort from the fact that people were now aware that he was serving on this jury. He stated that the publication of the picture would not affect his impartiality. All parties indicated they were satisfied with the juror's remaining on the panel; he was retained and instructed not to discuss the matter with the other jurors.

The judge has discretion in addressing issues concerning the effect of publicity on empanelled jurors, and we give deference to his conclusions. *Commonwealth* v. *Francis*, 432 Mass. 353,

---

[4]The jurors, of course, had been directed to avoid all publicity about the case, but the juror's family informed him of his photograph in the newspaper.

370-371 (2000). The judge acted appropriately. He interviewed the one juror who might have been affected by the publicity; that juror stated that he was unaffected by the incident; the judge, as well as the parties, were content that the juror remained impartial. The judge may accept a juror's statement of impartiality. *Commonwealth* v. *Colon-Cruz, supra* at 551. No other juror reported knowledge of the photograph.

The defendant claims, however, that his right to a fair trial was denied because, due to this photograph, the jurors knew that their friends or neighbors were aware that they were sitting on this particular case and, therefore, the jurors would feel "pressure to convict," or, put differently, "pressure to protect society" by punishing the person charged. The defendant argues that, had the venue been changed, the problem of juror exposure in their local newspaper would not have arisen. As an initial matter, there is no indication in the record that any juror other than juror no. 8 was aware of the photograph. Further, it is baseless speculation to assume that the jurors will ignore both their oaths and the judge's instructions and purposefully return an unwarranted verdict against the defendant because of imaginary "pressure" from their friends and neighbors. Such an assumption is without basis both in common experience in general, and on this record in particular. Without any foundation, it equates juror anonymity with juror ability to perform their sworn function. The defendant has not shown that he was denied a fair trial.

4. *The distracting juror.* Just before the Commonwealth rested, the judge was informed by a court officer that three jurors had complained about the behavior of juror no. 13. This juror had reportedly been "distracting" the other jurors by mouthing answers to questions, rolling her eyes, and moving her head in agreement or disagreement with testimony. The court clerk had made similar observations. The judge considered the matter overnight and eventually concluded that "benign neglect" was the wisest course of action. Both parties concurred with this result. Now, however, the defendant maintains that the judge should have conducted a hearing "and/or removed the juror." He claims that he was denied a fair trial because this

juror ignored the judge's instruction not to form a conclusion until the evidence was complete, because she was "affected by pretrial publicity," and because in another county this would not have occurred.

As to the defendant's claim that the judge should have conducted a hearing "and/or removed the juror," the defendant never requested the action he now seeks. The judge's treatment of the situation was within his discretion. Further, nothing in the record supports his claim that he was denied a fair trial because of this juror's state of mind. There is no reason to believe that juror no. 13's outward reactions to testimony indicated that she was ignoring the judge's instructions, or was not listening to all the testimony and according it appropriate weight. Our requirement that jurors have an open mind and not decide the case until all the evidence is complete does not impose on jurors the necessity to avoid all reaction to testimony. Such a requirement would be humanly impossible, and such reactions do not evidence bias or inattention on the part of the juror.[5]

The defendant posits that this problem would not have arisen in another venue, but there is nothing to suggest that this juror's outward behavior was the result of pretrial publicity. Moreover, the standard is not whether the incident would not have occurred in another venue. The inquiry is whether the defendant made an adequate showing in support of the request for a change of venue, and whether refusal to grant such a change was an abuse of discretion that deprived the defendant of a fair trial.

5. *Admission of the defendant's postarrest threat.* Evidence was admitted that after his arrest, in a recorded telephone call made from the jail to his girl friend, the defendant stated that Hector Cabrera had given him the firearm "when [the defendant] was running the corner." The defendant further stated that if Cabrera "hadn't talked, no one would have known. They wouldn't have been able to find me right away." He also said, "It's better if I wait until he ends up around here and I will kill

---

[5]Indeed, such reactions are sometimes the product of juror frustration with repetitive or cumulative testimony, or annoyance with attorney questioning that belabors the obvious.

him."[6] The defendant objected to the admission of this state-
ment and claims here, as he did below, that it is irrelevant,
prejudicial, and inflammatory. The statement was properly
admitted. In *Commonwealth* v. *Fernandes*, 427 Mass. 90, 93-94
(1998), the court considered the admission of a similar
statement. There, the defendant said that a coventurer had been
"shooting off his mouth about how [the victim] got killed," and
that "he [the defendant] wanted to . . . kill [the coventurer] so
he would stop talking." The court held that the statement was
admissible to establish consciousness of guilt. "Evidence show-
ing consciousness of guilt, such as a threat to kill a potential
witness, is admissible to prove that a defendant committed the
crime charged, even if it tends to indicate that the defendant
committed or planned to commit another offense." *Id.* at 94.
Here, the defendant's statement that "no one would have
known" is an implicit admission that he had committed the
killing. The statement was relevant as evidence of conscious-
ness of guilt. The defendant received an undeserved benefit
when the judge did not permit it to be read to the jury.

The defendant argues that the statement was unduly
prejudicial. It is clear from the judge's discussions with counsel
that he was cognizant of the potential for inherent prejudice. It
was for him to determine whether the evidence was unfairly
prejudicial. *Commonwealth* v. *Simpson*, 434 Mass. 570, 578-579
(2001). The judge concluded that the prejudice caused by the
disclosure of the defendant's threat did not outweigh its proba-
tive value. Absent "palpable error," a trial judge's discretion in
this regard will not be overturned on appeal. *Id.* We perceive no
such error.

In his charge to the jury, the judge referred specifically to this
evidence and gave appropriate limiting instructions. He clearly
instructed the jury to consider the evidence of the defendant's
statement only to the extent that it demonstrated consciousness
of guilt, and not to use it to infer that the defendant had the

---

[6]The transcript of this telephone conversation was admitted as a stipulation.
The judge did not permit the transcript to be read to the jury during the
presentation of the evidence, but allowed the prosecutor to quote from it in his
closing argument. If evidence is admissible, it is admissible during the trial
and may be read from or referred to in any appropriate manner. There is no
reason to limit it to use in closing argument.

propensity to commit the crimes with which he was charged. "The judge's instructions were clear, and we must presume the jury followed them." *Commonwealth* v. *Helfant*, 398 Mass. 214, 228 (1982).

6. *Denial of motion for a mistrial due to emotional display.* Massachusetts State Trooper John G. Murphy broke down while reading to the jury the defendant's statement to the police. The trooper attempted to read the statement again, but had the same reaction. The judge instructed the prosecutor to "move on" to another subject and the prosecutor did so. (Eventually the prosecutor read part of the statement to the jury, see *infra*, and another officer read the complete statement.) The defendant's motion for a mistrial after the trooper's first display of emotion was denied, with the judge noting that he did not "believe the jury is affected by [the witness's] reaction at this point." Defense counsel did not request a curative instruction at any point. Nothing in the record suggests that this emotional display was planned or that the prosecutor had any reason to anticipate it, and defense counsel at trial acknowledged as much. The declaration of a mistrial in such circumstances is a decision within the sound discretion of the judge who is in the best position to determine whether the incident is likely to prejudice a jury. The judge dealt appropriately with the situation once it became apparent that the witness could not continue reading the statement. There was no error in denying the motion for a mistrial.

We now consider the defendant's arguments that he was impaired in his ability to present his defense of self-defense.

7. *Voir dire question on self-defense.* The defendant asserts that the judge abused his discretion by refusing to question the potential jurors regarding their views on self-defense. There was no abuse of discretion. Beyond putting the statutory questions, see G. L. c. 234, § 28, the judge must "examine jurors fully with respect to possible bias or prejudice only when it appears that there is a substantial risk that jurors might be influenced by factors extraneous to the evidence presented to them." *Commonwealth* v. *Chandler*, 17 Mass. App. Ct. 1022, 1023 (1984). Otherwise, the "judge has broad discretion as to the questions to be asked, and need not put the specific questions proposed by

the defendant." *Commonwealth* v. *Sanders*, 383 Mass. 637, 641 (1981). Unless the defendant shows that there is a "substantial risk that the jury would be influenced by extraneous issues," *id.* at 639-640, the judge need not ask questions aimed at discovering the existence of those factors. *Commonwealth* v. *Ashman*, 430 Mass. 736, 738-740 (2000). There is no reason to suspect juror prejudice against claims of self-defense and the defendant has not shown a substantial risk of juror bias against such a defense. See *id.* (although individual voir dire required if lack of criminal responsibility may be an issue and if defendant so requests, see *Commonwealth* v. *Seguin*, 421 Mass. 243, 247-249 [1995], cert. denied, 516 U.S. 1180 [1996], rule not extended to encompass cases in which evidence of mental illness or mental impairment presented).

8. *Vouching for witness.* The defendant claims that the judge erred by permitting the prosecutor to vouch for a witness when the prosecutor read to the jury part of the defendant's statement to the police. After Trooper Murphy had lost his composure while reading the defendant's statement, it was necessary that parts of the statement be admitted in evidence so that the jury could understand further questions the prosecutor needed to ask about the circumstances of the questioning. As a result, the judge permitted the prosecutor to read those portions of the statement to the jury. The judge has "broad discretion in determining the method by which evidence is brought to the jury's attention. The burden of showing an abuse of [that] discretion falls squarely on [the defendant]." *Commonwealth* v. *Amazeen*, 375 Mass. 73, 84 (1978). No abuse of discretion has been shown. Vouching for a witness occurs when an attorney "expresses a personal belief in the credibility of a witness . . . or indicates . . . knowledge independent of the evidence before the jury verifying a witness's credibility." *Commonwealth* v. *Allison*, 434 Mass. 670, 685 (2001). Neither situation occurred here. The prosecutor simply read a portion of a statement. He did not express any belief in the credibility of the trooper or of the defendant and he did not indicate any knowledge apart from the evidence.

9. *Ineffective assistance of counsel.* The defendant maintains that he received ineffective assistance of counsel in violation of

his constitutional right under the Sixth Amendment to the United States Constitution. *Strickland* v. *Washington,* 466 U.S. 668 (1984). Specifically, he contends that his attorney failed to move for a mistrial after a witness's answer to a question. Gilberto Febus, in response to the question, "What was [Officer DiNapoli] doing [when the defendant was shooting at him]?" answered, "Honestly, the police officer have no chance to react." Defense counsel objected, the judge sustained the objection, directed the jury to disregard the answer and reminded them that the "answer is not evidence for your consideration."

We give deference to trial counsel's tactical decisions and ineffectiveness is not found unless those decisions were "manifestly unreasonable when made." *Commonwealth* v. *Coonan,* 428 Mass. 823, 827 (1999), quoting *Commonwealth* v. *Martin,* 427 Mass. 816, 822 (1998). Here, the witness's answer was brief and was immediately struck by the judge. Jurors are presumed to follow instructions to disregard testimony. *Commonwealth* v. *Cortez,* 438 Mass. 123, 130 (2002). A request for a mistrial probably would have been futile, and counsel reasonably could decide to be content with the judge's forceful instruction. We give due deference to defense counsel's strategic decisions and conclude that his strategy was not manifestly unreasonable. *Commonwealth* v. *Coonan, supra* at 827. With the overwhelming evidence of the defendant's guilt, we reject the suggestion that this inadvertent editorializing by the witness, immediately corrected by the judge, somehow constitutes a substantial likelihood of a miscarriage of justice.

10. *Closing argument.* The defendant contends that the prosecutor's closing argument improperly commented on the defendant's failure to testify and thereby deprived him of his constitutional right to remain silent. We review the closing argument as a whole, *Commonwealth* v. *Dixon,* 425 Mass. 223, 230 (1997), and we "consider the fact that the defendant did not object to the statement at trial as 'some indication that the tone [and] manner . . . of the now challenged aspects of the prosecutor's argument were not unfairly prejudicial.' " *Commonwealth* v. *Lyons,* 426 Mass. 466, 471 (1998), quoting *Commonwealth* v. *Mello,* 420 Mass. 375, 380 (1995). Further, because there was no objection to the statement, we confine our

examination to whether the statement created a substantial likelihood of a miscarriage of justice. *Commonwealth* v. *Degro*, 432 Mass. 319, 326 (2000).

The prosecutor remarked, "[I]f it was self-defense, you would think [the defendant] would want to tell the truth about how the shooting actually happened. If he's acting in self-defense, then isn't he . . . going to want to say the truth about how the shooting happened?" Standing alone, this statement might well be considered comment on the defendant's failure to testify. But the defendant has removed this statement from its context. The objectionable statement occurred in the following sequence: "It's also interesting what the defendant did not say in his statement. . . . He didn't say anything that would suggest that he was in fear of death. He was in fear of being arrested. That's what he was afraid of. It's also interesting when you look at his statement with respect to the lies that he told about how the shooting occurred . . . . But let's look at what he said about how the shooting occurred, because if it was self-defense, you would think that he would want to tell the truth about how the shooting actually happened. . . . What's the first thing he says that really relates to how it happens? I never had a gun in my hand before . . . ." In the context of the argument being made, the prosecutor's reference is not to the defendant's failure to testify at trial, but to the fact that when the defendant gave a statement to the police in Scranton, Pennsylvania, he never mentioned anything related to self-defense. In this way, the prosecutor permissibly suggested that the defendant's self-defense theory was a later contrivance. The prosecutor is entitled to comment on the defendant's statement and to compare it to the evidence in the case. See *Commonwealth* v. *Martino*, 412 Mass. 267, 282-284 & n.11 (1992) (no comment on right to silence when defendant made lengthy statement to police that was introduced in evidence; given detail of statement, defendant's omissions could be found to be significant and prosecutor entitled to comment on them). The defendant gave a lengthy, detailed statement to the police and his failure to indicate that he had acted in self-defense was the subject of proper comment. The prosecutor may comment on omissions from statements the

defendant has made and on the significance of what the defendant did say. The prosecutor's remark was proper.

11. *Relief pursuant to G. L. c. 278, § 33E.* We have considered all the defendant's other arguments and have reviewed the entire record pursuant to our obligation under G. L. c. 278, § 33E. There is no reason to reduce the jury's verdict or to order a new trial. The defendant received a fair trial; the jury's verdict is consistent with the evidence.

*Judgment affirmed.*