NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

SJC-13231

COMMONWEALTH  vs.  BRITTANY SMITH.


Franklin.     April 10, 2023. - August 10, 2023.

Present:  Budd, C.J., Gaziano, Cypher, Kafker, & Wendlandt, JJ.


Homicide.  Joint Enterprise.  Evidence, Joint enterprise.  Jury
    and Jurors.  Practice, Criminal, Capital case, Venue, Jury
    and jurors.



    Indictments found and returned in the Superior Court
Department on December 19, 2016, and March 31, 2017.

    The cases were tried before John A. Agostini, J.


    Richard J. Shea for the defendant.
    Cynthia M. Von Flatern, Assistant District Attorney, for
the Commonwealth.


    KAFKER, J.  A jury convicted the defendant, Brittany Smith,

of two counts of murder in the first degree on theories of

deliberate premeditation, extreme atrocity or cruelty, and

felony-murder for the deaths of Thomas Harty and Joanna Fisher.

The defendant's codefendant, Joshua Hart, was tried and

convicted separately of the same charges.  The defendant, who

was tried after Hart, was convicted on a theory of joint venture. She was also convicted of two counts of home invasion, two counts of armed robbery, one count of larceny of a motor vehicle, and one count of credit card fraud. Prior to trial, the defendant filed a motion for a change of venue, which the trial judge denied.[1]

On appeal, the defendant challenges her conviction of murder in the first degree of Harty, on the basis of all three theories supporting the verdict, and her conviction of murder in the first degree of Fisher, solely on the basis of deliberate premeditation.[2] She raises three principal arguments: (1) that because of extensive pretrial publicity, the judge erred in denying her motion for change of venue, and that, as a result of that denial, she was not tried by an impartial jury; (2) that the evidence was insufficient to prove her guilt as a joint venturer of murder in the first degree of Harty; and (3) that the evidence was insufficient to prove her guilt as a joint

---

[1] After a hearing on various pretrial motions including the defendant's motion for a change of venue, the trial judge withheld ruling on the change of venue motion, indicating that he wanted to start empanelment in order to understand the extent of pretrial publicity and to establish whether any prejudice stemmed from that publicity. The judge did not subsequently specifically rule on the motion, but venue was not changed.

[2] The defendant raises no arguments with respect to her other convictions.

venturer of murder in the first degree on the basis of deliberate premeditation of Fisher.

We discern no reversible error in our review of the defendant's appeal. Additionally, after a full review of the record, we conclude that there is no reason to grant relief pursuant to G. L. c. 278, § 33E.

Background. We summarize the facts as the jury reasonably could have found them, reserving certain details for later discussion.[3] The charges against the defendant and Hart stem from a home invasion that occurred in Orange on the evening of October 5, 2016. The defendant and Hart, who were in a romantic relationship and who both were then residing in the Orange area, were making a plan to leave the area. The two had been arrested several days earlier for the larceny of the defendant's great-grandmother's car and were also under investigation as suspects in other incidents -- of breaking and entering -- that had occurred in the area. Additionally, the defendant, who had a drug addiction (and who had met Hart through her drug dealer), was due to appear in court on October 7 in connection with the larceny charge. The defendant's mother intended to petition the court to have the defendant committed, or "sectioned," for

---

[3] At trial, the jury heard audio recordings of statements that Hart and the defendant gave, separately, to the police after the police arrested them. The facts set forth herein are drawn largely from those recordings.

substance abuse treatment pursuant to G. L. c. 123, § 35. The defendant, however, did not want to be committed because she did not want to be separated from her young son or from Hart. Hart, who had a prior criminal record and outstanding warrants in other jurisdictions, also did not want to appear in court to face the larceny charges.

On the day of October 5, while at Hart's step-grandmother's house, the defendant took certain medications -- Soma, a muscle relaxant; and Gabapentin, an antianxiety medication -- to try to avoid effects of heroin withdrawal because she did not have any heroin. She and Hart decided that they would find a home to break into to get money and a car so that they could leave town. They left Hart's step-grandmother's house on foot. The defendant then stopped at her grandmother's house on East River Street, where she saw her mother, while Hart waited at a nearby market; after that, the two continued on foot, walking along East River Street. As the defendant's uncle was driving on East River Street that evening, he saw her walking with a man.

After considering various other potential target houses, Hart and the defendant eventually decided to break into a house on East River Street, where they saw through a window an elderly man seated in a chair. They also saw, in the house's garage, an older model car, which Hart thought would be a good car to steal because he thought it would be harder to track.

Hart initially tried to break into the house via a window, with some assistance from the defendant, but ultimately the two entered the home through the unlocked garage.  In the garage, before entering the house, they noticed that the car had keys in it.  Hart indicated that he and the defendant each picked up a socket wrench in the garage and had the wrenches in hand when they then entered the house.  Hart also stated that, once inside the house, he saw a knife on the kitchen counter and picked that up because he thought it was a better weapon.

From the garage, before entering the rest of the house, Hart saw the man -- Harty -- sitting in a chair in the living room.  Harty was ninety-five years old.  Hart and the defendant also knew, at that point, that a second person -- Fisher -- was in the home and seated in her wheelchair, also in the living room.  Fisher was seventy-seven years old and had suffered a spinal stroke three years earlier.  Hart and the defendant made a quick plan that, after entering the house, Hart would "intimidate" Harty and the defendant would "intimidate" Fisher.  Hart stated that when Harty saw Hart coming into the house, Harty stood up and started to approach him, which surprised Hart.  Hart then stabbed Harty with the knife that he had picked up in the kitchen.  He also held a pillow to Harty's face to suffocate him.  Hart initially told the police that he pushed Fisher out of her wheelchair so that she fell to the floor,

stabbed her, hit her in the head with the socket wrench, and briefly tried to suffocate her with a pillow. While this was happening, according to what Hart initially told the police, the defendant was searching the house for money.

The defendant, however, told the police that she had attacked Fisher before Hart did so -- that she pushed Fisher out of her wheelchair, put a pillow over Fisher's face and hit Fisher with her fist through the pillow, and then attempted to stab Fisher. Initially, the defendant told the police that she "couldn't do it" -- that she attempted to stab Fisher in the area of her hip and made contact with Fisher's clothes and skin but did not "puncture" Fisher's skin. The defendant also later acknowledged, however, during the police interview, that she may have punctured Fisher's lung. After Hart learned from the police that the defendant had admitted what she had done, he also admitted to the police that the defendant had been involved in the attack on Fisher. He stated that he had initially told the police that only he had attacked Fisher because he wanted to protect the defendant.[4]

---

[4] Prior to trial, the defendant filed a motion in limine to admit Hart's statements to the police, either as statements against penal interest or as third-party culprit evidence. The judge allowed the motion, indicating that all of Hart's statements would be submitted to the jury. The defendant made a reasonably calculated decision regarding the admission of Hart's statements, and they were admitted at her own request. In general, "the admission of a nontestifying codefendant's

When Hart and the defendant left the house, they took with them money, credit cards, and cellular telephones belonging to the victims.  They also turned out the lights, closed the shades, and disabled the house's cordless telephones.  They stopped at a nearby convenience store for cigarettes, drove to Fitchburg where the defendant purchased heroin and cocaine, and then drove south.  They stopped at several department stores in various States, purchasing new clothes and food; along the way, Hart disposed of the clothes they had been wearing at the time of the attack.  He also disposed of the knife.  The police subsequently arrested them in Virginia on October 8, 2016 (three days after the attack).

Meanwhile, on the morning following the attack, a nurse who visited Fisher regularly at home to provide physical therapy services arrived as scheduled.  Her coworker arrived shortly thereafter, and as they made their way into the house together, they noticed things out of place -- among other things, they

---

statement, naming the defendant as a participant in the crime . . . violate[s] the defendant's right to confrontation under the Sixth Amendment [to the United States Constitution]." Commonwealth v. Resende, 476 Mass. 141, 150 (2017), citing Bruton v. United States, 391 U.S. 123, 126 (1968).  Although the issue often arises in cases where codefendants are tried together, the admission of Hart's statements might have raised a concern pursuant to Bruton, even where the defendant and Hart were tried separately.  Because, however, Hart's statements were admitted at the defendant's own request, the Bruton rule is not implicated.

noticed items strewn across the ramp that Fisher used to access the house in her wheelchair, and that the door from the garage to the kitchen, which was usually closed, was wide open. When they entered the house, the nurse heard Fisher, who was still alive, moaning. Fisher then called out to the nurse and told her that there had been an "invasion" and that "they" tried to kill her. The nurse and her coworker immediately contacted the police, who arrived shortly thereafter and found that Harty was dead. Fisher was brought to a hospital with multiple stab wounds, multiple rib fractures on the right side, and a small pneumothorax or punctured lung. Although Fisher initially survived, she subsequently died on November 10, 2016, as a result of the attack.[5]

Discussion. 1. Change of venue. In light of media coverage of the murders, both at the time they occurred and just prior to trial, the defendant sought a change of venue pursuant to Mass. R. Crim. P. 37 (b), 378 Mass. 914 (1979).[6] As noted,

---

[5] The initial charges against both Hart and the defendant included one count of murder and one count of attempted murder. After Fisher died, Hart and the defendant were each subsequently charged with a second count of murder.

[6] Because Hart's trial took place shortly before the defendant's trial, the pretrial publicity related to the defendant included not only media coverage of the murders at the time that they occurred in 2016 but also more recent coverage of Hart's trial, including that a jury convicted him of the murders.

see note 1, supra, the judge declined to rule on the motion at the time he heard it and chose instead to wait to see whether an impartial jury could be empanelled.  More specifically, the judge stated that he wanted to start empanelment "in order to understand the extent of saturation of media coverage and to establish prejudice, if any, stemming from extensive pretrial publicity or settled community opinion."

Determining whether extensive pretrial publicity violates a defendant's right to a trial by an impartial jury pursuant to the Sixth Amendment to the United States Constitution and art. 12 of the Massachusetts Declaration of Rights requires a two-step analysis.  "First, we examine 'whether a change of venue was required because the jury were presumptively prejudiced against [the defendant].'  [Commonwealth v. Toolan, 460 Mass. 452, 462 (2011), S.C., 490 Mass. 698 (2022).]  If it is determined that the jury were not presumptively prejudiced, 'we next examine whether the defendant has shown actual juror prejudice.'  Id."  Commonwealth v. Mack, 482 Mass. 311, 315 (2019).  Here, the defendant does not allege, and the record does not reflect, presumptive prejudice, and we therefore consider only whether the defendant has shown actual juror prejudice.  See id.

To demonstrate actual juror prejudice, the defendant "must show that, in the totality of the circumstances, pretrial

publicity deprived [her] of [her] right to a fair and impartial jury."  Commonwealth v. Hoose, 467 Mass. 395, 408 (2014), citing Commonwealth v. Morales, 440 Mass. 536, 542 (2003).  "A defendant's right to a fair and impartial jury does not require that the jury members have no prior knowledge of the crime." Morales, supra, quoting Commonwealth v. Colon-Cruz, 408 Mass. 533, 551 (1990).  Where, as here, a case "has been the subject of pretrial publicity, the voir dire procedures utilized by the judge are particularly important."  Hoose, supra, citing Toolan, 460 Mass. at 466-467.

The voir dire procedure in this case was extensive. Indeed, the defendant does not argue otherwise; nor does she argue that the judge failed to address any potential juror bias. Over the course of four days, the judge conducted individual voir dire of 139 potential jurors, during which the judge and counsel for both parties questioned the potential jurors, each of whom had also completed a detailed questionnaire.  Of the fourteen seated jurors, three had heard nothing about the case prior to the trial.  The remaining eleven jurors all indicated that they had heard about the case but nothing more than what

the judge had set forth in the summary that he provided for the entire venire.[7],[8]

As each juror was selected, the judge instructed the juror not to discuss the case with anyone, including fellow jurors; not to read, see, or hear anything about the case; not to go to any scenes that the judge may have described in his brief summary of the allegations; and not to conduct any independent research related to the case.  Furthermore, throughout the trial, the judge reminded the jurors of these instructions as they were dismissed at the end of each day of trial, and he

---

[7] That summary set forth the outlines of the Commonwealth's "allegations" -- that Hart and the defendant entered the victims' home intending to rob them and steal their car; that Hart brutally attacked Harty, killing him; that the defendant, and then Hart, attacked Fisher and that the attack did not result in her immediate death; that Hart and the defendant left her on the floor and disabled the telephones; that Fisher crawled outside to seek help, was unsuccessful, and then lay on the floor inside for twelve hours until she was found the next day; that she subsequently died as a result of the attack; and that Hart and the defendant stole money and credit cards from the victims and fled to Virginia.

[8] One of the seated jurors indicated that he was aware that there had been another trial (i.e., Hart's trial) and that he believed that there had been a conviction but that he had not followed the story "too closely."  Although other jurors who indicated awareness of Hart's trial were excused, the seated juror, who was extensively questioned, clearly stated that knowing that information would not affect his judgment in the defendant's case because the two cases needed to be considered separately, i.e., the juror could remain impartial.  Defense counsel also chose not to exercise a peremptory challenge for this juror, even though she had numerous challenges remaining at the time.

inquired of the jurors whether anyone had done any of those things when they returned to court each day (to which there were never any affirmative responses).

The steps taken by the judge "to safeguard the defendant's right to an impartial jury," see Hoose, 467 Mass. at 409, did just that. The defendant argues, among other things, that a high percentage of the venire were aware of the crimes due to pretrial publicity, but, again, a juror need not have no prior knowledge in order to be impartial. See Morales, 440 Mass. at 542. She also raises certain arguments that would apply to any potential jurors, not just those exposed to the crimes through pretrial publicity, including a concern that the nature of the crimes would likely arouse strong sympathy for the victims and anger at Hart and the defendant. The judge was "well aware of the potential for prejudice in the minds of the jurors and proceeded with extreme caution to assure that the jurors selected were unswayed by any media publicity and were impartial." Id. at 542-543, citing Colon-Cruz, 408 Mass. at 551. The defendant has failed to show any actual juror prejudice or that she was tried by anything but a fair and impartial jury.

2. Sufficiency of the evidence. "In reviewing the sufficiency of the evidence, . . . [w]e consider whether, after viewing the evidence in the light most favorable to the

Commonwealth, any rational trier of fact could have found the essential elements of the crimes beyond a reasonable doubt." Commonwealth v. Ayala, 481 Mass. 46, 51 (2018), citing Commonwealth v. Latimore, 378 Mass. 671, 677-678 (1979). "The evidence may be direct or circumstantial, and we draw all reasonable inferences in favor of the Commonwealth." Ayala, supra, citing Commonwealth v. Rakes, 478 Mass. 22, 32 (2017).

a. Harty. The defendant argues that the evidence was insufficient to convict her of the murder of Harty on any of the three bases upon which the jury reached their verdict. To prove a defendant guilty as a joint venturer under both the theory of deliberate premeditation and the theory of extreme atrocity or cruelty, the Commonwealth has to "prove beyond a reasonable doubt that the defendant knowingly participated in the commission of the crime charged, and that the defendant had or shared the required criminal intent" (quotation and citation omitted). Commonwealth v. Watson, 487 Mass. 156, 162 (2021).

i. Knowing participation. There was sufficient evidence that the defendant knowingly participated in the murder of Harty. She and Hart set out to rob someone and steal a car and armed themselves as they proceeded to carry out their plan. They eventually settled on the victims' house, and entered the house knowing that two people were inside. They also did so after seeing that the car that they intended to steal already

had the keys in it and could therefore be stolen without confronting those in the house.

When they entered the house, they were each armed with a socket wrench, and, at least according to the defendant, Hart also had a knife that he had taken with him from his step-grandmother's house. Once inside the home, while Hart was stabbing Harty, the defendant was herself engaged in physically attacking Fisher. The attacks, resulting in the deaths of both victims, were coordinated. Before they left the victims' house, Hart and the defendant took credit cards and cellular telephones. They also disabled the victims' cordless telephones, making it impossible for Fisher, who was then still alive, to call for help. Additionally, they closed the blinds or shades in the house so that no one could see in from the outside. And then they fled.

ii. Criminal intent. There was also sufficient evidence from which the jury could conclude that the defendant "shared the mental state of malice aforethought for murder in the first degree under the theories of deliberate premeditation and extreme atrocity or cruelty." Watson, 487 Mass. at 163. In order to convict the defendant on the basis of deliberate premeditation, the Commonwealth was required to prove that she knew that Hart intended to kill Harty and that she shared that intent. See id. The defendant's presence does not alone

establish her participation, but there was sufficient evidence that the defendant "consciously . . . act[ed] together [with Hart] before or during the crime with the intent of making the crime succeed." Commonwealth v. Gonzalez, 475 Mass. 396, 414 (2016), quoting Commonwealth v. Zanetti, 454 Mass. 449, 470 (2009) (Appendix). The evidence was sufficient to demonstrate a coordinated, concerted, armed, and deadly attack against both victims. Importantly, "a plan to murder may be formed in seconds" (citation omitted). Commonwealth v. Tavares, 471 Mass. 430, 435 (2015).

The jury could have found that Hart intended to kill Harty. Hart entered the home armed with a socket wrench, and a knife from his step-grandmother's house.[9] The defendant also knew that Hart had both a knife and a socket wrench on his person when he entered the house. When Harty stood up from his chair and started toward Hart, Hart stabbed him multiple times. The jury could also have found that the defendant's "actions demonstrated 'knowledge of the circumstances and participation in the crime,' leading to the conclusion that the defendant shared [Hart's] intent with respect to killing [Harty]." Tavares, 471 Mass. at

---

[9] In his interview with the police, Hart stated that he picked up the knife that he used to stab the victims from the kitchen counter in the victims' house. He also stated that he could not remember whether he had one knife or two. The jury could have found that Hart came armed with a knife, as the defendant stated in her interview with the police.

435.  As explained supra, the defendant knew that Hart was armed with a knife and a socket wrench.  She likewise entered the house armed, after they specifically chose the victims' house and knowing that there were two people inside.  Hart and the defendant also coordinated their attack, with Hart attacking the elderly male victim while the defendant attacked the elderly female victim.

As to proving that the defendant committed murder in the first degree on the basis of extreme atrocity or cruelty, the Commonwealth also proved that she had the required malice:  "an intent to cause death, to cause grievous bodily harm, or to do an act which, in the circumstances known to the defendant, a reasonable person would have known created a plain and strong likelihood that death would follow."  Watson, 487 Mass. at 164, quoting Commonwealth v. Sokphann Chhim, 447 Mass. 370, 377 (2006).  The evidence that, among other things, Hart and the defendant entered the house armed and that Hart used a knife to attack Harty, while the defendant pushed, punched, and stabbed the wheelchair-bound Fisher, was sufficient to demonstrate the necessary intent.  There was also sufficient evidence to prove the murder was committed with extreme atrocity or cruelty. Harty was ninety-five years old and stabbed multiple times by Hart while the defendant attacked his wheelchair-bound seventy-seven year old wife in Harty's presence.  Hart and the defendant

also ensured that no one could discover or assist the victims by disabling the telephones, turning out the lights, and closing the shades. As they left the murder scene, the defendant called her drug dealer, further displaying her indifference to the victims' suffering.

   iii. <u>Felony-murder</u>. There was also ample evidence to support the defendant's conviction of Harty's murder on the basis of felony-murder. For purposes of felony-murder, a jury may "find a defendant guilty of murder in the first degree where the murder was committed in the course of a felony punishable by life imprisonment even if it was not committed with deliberate premeditation or with extreme atrocity or cruelty." <u>Commonwealth</u> v. <u>Brown</u>, 477 Mass. 805, 807-808 (2017), cert. denied, 139 S. Ct. 54 (2018). A conviction of felony-murder requires a finding of actual malice, and therefore,

> "a defendant who commits an armed robbery as a joint venturer will be found guilty of murder where a killing was committed in the course of that robbery if he or she knowingly participated in the killing with the intent required to commit it -- that is, with the intent either to kill, to cause grievous bodily harm, or to do an act which, in the circumstances known to the defendant, a reasonable person would have known created a plain and strong likelihood that death would result."

<u>Id</u>. at 832 (Gants, C.J., concurring).

   Harty was killed in the course of Hart and the defendant's armed robbery of his and Fisher's home. The jury could reasonably have concluded, based on the evidence set forth

supra, that the required malice was present as a part of, and during the course of, that armed robbery -- that Hart and the defendant entered the victims' home armed and with an intent to cause grievous bodily harm or to do an act that the defendant would have known created a "plain and strong likelihood" of death.[10]

b. Fisher. In appealing from her conviction of the murder of Fisher, the defendant concedes that there was sufficient evidence of malice and argues only that there was not sufficient evidence of deliberate premeditation. In other words, she does not contest the conviction on the theory of extreme atrocity or cruelty or on the theory of felony-murder; she contests only the conviction in so far as it was based on a theory of premeditated murder. The evidence that supported the conviction of the murder of Harty on the theory of deliberate premeditation similarly supports the conviction of the murder of Fisher on that theory. The attacks against the victims, as described supra, were concerted, coordinated, and armed. The defendant tossed Fisher, a frail, wheelchair-bound, seventy-seven year old

---

[10] To the extent that the defendant suggests that she did not know what she was doing -- that she could not have knowingly participated or formed the requisite intent for murder -- because she was "not all there" or "high," there was sufficient evidence from which the jury could have inferred that the drugs that the defendant had taken that day because she did not have any heroin, Soma and Gabapentin, would not have had this effect on her.

woman, out of her wheelchair, punched her and stabbed her, and left her to die. Even if this were not sufficient evidence of deliberate premeditation, and we conclude that it was, the defendant would still be guilty of murder on the theories of both extreme atrocity or cruelty and felony-murder, which, again, she does not contest. See Commonwealth v. Samia, 492 Mass. 135, 140-141 (2023), citing Commonwealth v. Wadlington, 467 Mass. 192, 208 (2014) (conviction of murder in first degree based on deliberate premeditation still stands even where conviction based on felony-murder is vacated).

3. Review under G. L. c. 278, § 33E. Finally, we have reviewed the entire record in accordance with G. L. c. 278, § 33E, and discern no basis to set aside or reduce the verdicts of murder in the first degree.

Judgments affirmed.